# THOMAS KEATING COMPANY v. INLAND STEEL COMPANY.[1]

November 30, 1923.

No. 23,605.

**Judgment notwithstanding verdict unwarranted simply because verdict was excessive.**

1. In this action for damages because of the lessee's violation of the terms of a mining lease, the lessee was not entitled to judgment non obstante veredicto, for there was evidence warranting a substantial recovery, though not in the amount awarded.

**Action could await termination of the lease.**

2. The nature of the claims asserted were such that the lessor could await the termination of the lease before instituting suit to recover thereon.

**Amount of verdict not supported by evidence.**

3. The evidence examined and *held* not to warrant the jury in awarding a verdict in the amount rendered.

**Construction of lease as to customary manner of working mines.**

4. Provisions in a mining lease, running for a long term of years, requiring the mine to be worked in the usual and customary manner, must be construed to mean the usual and customary manner at the time the work is done, and not at any subsequent period when mining methods may have greatly changed, and lower grades of ore could be mined at a profit.

**Removal of lean ore in order to treat it so as to be merchantable.**

5. Under the agreement modifying the lease, and which permitted stripping and open pit mining, it was contemplated that lean ore might be removed from the premises for the purpose of treating it so as to make it merchantable, if practicable; but if, by the use of proper machinery and appliances in a workmanlike manner according to good engineering practice, it was found that merchantable ore could not be produced profitably, defendant was not obligated to treat the ore deposited in the dumps.

[1]Reported in 195 N. W. 1016.

**Defendant liable for removal of tramway rails.**

     6. The defendant is liable for injury to the tramways by the removal of the rails thereon.

Action in the district court for Crow Wing county to recover $212,-500 upon a mining lease. The case was tried before Stanton, J., who at the close of the testimony denied defendant's motion for a directed verdict and a jury which returned a verdict for $44,618. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed.

*Abbott, MacPherran, Gilbert & Doan,* for appellant.

*M. E. Ryan* and *Grace, Fridley & Crawford,* for respondent.


HOLT, J.

Margaret Keating owned an undivided three-fourths interest, and George H. Crosby the remainder in a forty in Crow Wing county bearing iron ore at a depth of 60 to 75 feet, and extending in places down to a 250-foot level. In 1908 Mrs. Keating, her husband Thomas joining, leased her interest to Crosby for 50 years, for the purpose of exploring and mining, stipulating for a royalty of 25 cents per ton of "merchantable shipping ore" removed, and also for a minimum royalty per year. One Haley owned a forty to the north which also contained iron, and he also gave a mining lease thereon. These leases in 1910 came into the hands of defendant, who undertook to explore and mine the two properties, as an underground mine, known as the Thompson mine. A concrete shaft was sunk to a 250-foot level, just north of the line dividing the Keating from the Haley forty. Results were somewhat disappointing in that a great part of the ore body contained silica and was too lean to be merchantable.

The parties then conceived that by open pit mining the separation of the lean ore from the merchantable shipping ore might be facilitated, and the former beneficiated so as to become merchantable. A modification of the leases to permit stripping and open pit mining, with a view to washing and beneficiating the lean or low grade ore was effected in May, 1913, and thereupon stripping operations be-

gan. An ore body on the northwesterly part of the Keating forty running into the southeasterly part of the Haley forty was uncovered to the width of about 200 feet. The stripping or overburden was moved to land north of these forties, also the lean ore and waste material from the ore body, the lean ore being dumped in a separate pile. There was a further modification reducing the royalty on the Keating interest in 1915, but this seems to have no bearing upon the issues in the case.

Mrs. Keating died testate, her husband being the sole devisee. The estate was administered, the forty in question distributed to Thomas Keating and the executor discharged. Prior to this action Keating assigned and sold the lease to plaintiff and all claims and demands arising from the operation of the mine. Defendant by notice, as permitted in the lease, terminated the same at the end of 1919.

This action was brought upon 3 claimed violations of the lease, viz.: That the defendant did not beneficiate the lean ore dump, consisting of about 300,000 tons which could have been rendered merchantable, thereby causing the lessor a loss of $62,500; that in stripping and mining defendant violated the lease, which provides that mining was to be done in a proper and skilful manner so as not to permit any unnecessary or unusual permanent injury to the mine or inconvenience or hindrance in the subsequent operation thereof, to the damage of the lessor in the sum of $150,000; that defendant removed all supports in the tunnels and all tramways to the lessor's damage in the sum of $10,000. All three claims were submitted to the jury and a verdict rendered for $44,618. Defendant's motion in the alternative for judgment or a new trial being denied, it appeals.

The motion for judgment notwithstanding the verdict was rightly denied. There was definite testimony that a merchantable ore body of 31,000 tons was left in such position by improper mining that it cannot be recovered in future operations. This would entitle plaintiff to a substantial verdict. So would also the removal of the rails in the tramways, hereinafter referred to.

The point that plaintiff did not succeed to the right of action possessed by Margaret Keating is not sustained. It is argued that the

cause of action which Margaret Keating had, vested in the executor and did not survive his discharge so as to pass by the decree of distribution. This is too technical. Thomas Keating was the executor and also the sole distributee. He succeeded to the rights of the lessor. The cause of action was of the sort which gave the lessor an election to treat a violation of the lease as at once giving rise to a cause of action, or to abide a termination of the lease. In this case the argument is also near at hand that the cause of action on all 3 items did not arise until the lease ended, for, if suit had been brought before that time, a good answer would have been that no time was specified within which the lean ore should be beneficiated, and so long as defendant remained in possession under the lease it could remedy any defects in its work or restore any fixture removed so as to leave the mine in the condition which the lease required. In short, it was with the lessor to sue for an anticipatory breach, or wait until defendant's time for performance came to a close, when its defaults in treating the lean ore or in mining operations could not be remedied. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. ed. 953; Alger-Fowler Co. v. Tracy, 98 Minn. 432, 107 N. W. 1124; 13 C. J. 653.

But, aside from the estimated 31,000 tons of merchantable ore, which plaintiff proved by fairly satisfactory evidence not now to be recoverable because of defendant's faulty mining methods, and the value of rails removed from the tramway, we think the verdict is not supported and a new trial should be had.

Plaintiff's main support comes from the mining engineer Ober and Mr. Keating. Mr. Keating is an elderly man of uncertain recollection and limited business experience. He is unable to keep any written data to assist his memory. His testimony is necessarily unreliable and inconsequential. That of Mr. Ober appears to be based on estimates founded upon unknown or uncertain data. For instance, in the so-called hanging wall on the south side of the open pit, he estimated an ore body of 300,000 tons that could not now be recovered because part thereof had caved in so that the berm on top had become so narrow that the sand from the slope would run in. But he had no knowledge whether the 300,000 tons or any

substantial part thereof, except the 31,000 tons mentioned, contained merchantable shipping ore, or ore that could be made merchantable by any process which would leave a profit. Evidence so doubtful and so conjectural does not justify an award of large sums as damages. He had not investigated the underground tunnels, cross-cuts or raises, and yet estimated it would take $100,000 to put the mine in a proper condition for further operation. In part he based the estimate on the supposition that, for lack of adequate berms, sand had run down into the raises in the underground mine, and yet he had not been down farther than 16 feet in one of them. If plaintiff's evidence sufficed at all for a verdict, it should have been for over $100,000. We take it that the jury merely guessed at the .amount. However, we conclude that, considered from the view point of breach as well as damages, the evidence is too uncertain and speculative to support a verdict for $44,618.

The provisions of the original lease which are alleged to have been broken are these: "The lessee shall open, use and work the said mines in such manner only as is usual and customary in the skilful and proper mining operations of similar character when conducted by the proprietors, mining all merchantable ore clean as the work progresses, so as not to do, cause or permit any unnecessary or unusual permanent injury to the same, or inconvenience or hindrance in the subsequent operating of the same mine or mines, and in the working of said mine or mines the lessee shall deposit all earth, rock or other useless material or rubbish at such places and in such manner as will not conflict or embarrass the future operating of said mines." There is no testimony whatever to show that the underground mining was not properly conducted or the works left in good condition, save as to taking out some steel rails. This kind of mining was carried on until the modification in 1913, also partly while the open pit mining was conducted, and after its cessation. So that the improper method or manner of the mining operations, to the injury of the mine, can only be charged against the open pit mining. Mr. Ober admitted that filling the pit when defendant returned to underground operations was not improper, provided a mat of boards, rock or other substance capable of holding

back the sand, was first placed in the bottom of the pit. The cave-in of the hanging wall served as a good mat where it covered, and there was positive testimony that under other parts of the fill boards were laid.

This mining lease was to run for 50 years. When made the parties contemplated underground mining only. It must be expected that mining methods would change during a 50-year period. What was skilful and customary mining at the time of this trial was not the test to be applied 10 or more years ago. And even now the evidence fails to show that, in the one or few raises where sand has flowed into the underground workings, any ore of merchantable value was injured or rendered unrecoverable. It does clearly appear that the ore formations in the Keating forty are not uniform. The merchantable and unmerchantable ores are found intermingled, or in narrow, adjacent, alternate strips, bodies or layers. Again, what was considered merchantable shipping ore at the trial may not have been so considered at the time the mining operation was conducted. Under the original lease the lessee was not required to mine clean any other than merchantable shipping ore, and deposit useless material in such a manner as not to embarrass the future operations of the mine. The mining operations under the lease must therefore be judged as to whether done skilfully according to the usual and customary manner as of the time when the work was done and not as of a time 10, 20, or 50 years thereafter. So also what was waste material and nonmerchantable ore must be judged as of the time of the mining.

We understand no claim is made for damages because useless materials, such as the stripping, rocks and worthless ore, were removed from the forty in question and placed on land of others. But the real contention is that the lean ore, especially that which came from the open pit of the Keating forty, was removed under the modification of 1913, with the understanding that defendant should be obligated to beneficiate all, so as to make merchantable shipping ore thereof. And plaintiff insists that this should be done without regard to whether it could be done at a profit to defendant. The object and purpose of the modification appears wherein it is stated

that the mining operations conducted under the lease have shown up iron ore in the land "some of which is merchantable in its natural condition, as the same is found in said mines, and some of which is too low in iron content to be merchantable in its natural condition; and it is the desire of all parties hereto, if practicable, that said low grade ore be utilized by washing, screening, or otherwise treating the same, so as to remove portions of silica and other waste material found therein, and by such treatment render the ore merchantable." Provision is then made for removing from the premises, if so desired, ore under 55 per cent of metallic iron content when dried at 212° Fahrenheit, for treatment, a specified royalty to be paid for the resulting merchantable ore shipped. It is evident that treating, or beneficiating ore from that mine was largely an experiment. Defendant no doubt hoped for and expected success, but did not bind itself to treat all lean or low grade ore removed or any part thereof, unless practicable. This must be interpreted to mean that defendant should treat that kind of ore by proper machinery and appliances in workmanlike manner according to good engineering practise, provided it could be done at some profit. There surely was no intention, and none can be implied from the language of the agreement, that defendant should treat the removed or lean or low grade ore at a loss. Defendant did build a washing plant for $26,-000 and treated some 27,000 tons of lean ore, but it seems the result was not profitable or practicable. The silica was so intimately mingled with the ore in some parts of the formation that it was impossible to reduce its contents by ordinary methods of beneficiation to such an extent that a merchantable product could be produced profitably. Defendant had expended several hundred thousand dollars in stripping and developing the Thompson mine for underground mining and had taken out and deposited these lean or low grade ore dumps of about 300,000 tons from the Keating forty. It stands to reason that it would not have terminated the lease, or have been willing to turn over to the lessor these dumps, as it has offered to do, if it were practicable by washing or treating to profitably convert the same into a merchantable product. Therefore if plaintiff desires to recover heavy damages for failure to treat these dumps, or for

having deposited merchantable shipping ore thereon, the proof should be reasonably clear and definite as to both amount and quality of the ore for which a recovery is awarded.

We are inclined to agree with plaintiff that, under the provision allowing defendant on the termination of the lease to remove its machinery, buildings and railway tracks, it could not remove the rails laid in the tramways underground, for it also specifies that the lessee "shall not remove or impair any supports placed in the mines, nor any timbers or framework necessary to the use and maintenance of the shafts or other approaches to the mines, nor any tramways within the mines." We think the rails are a part of a tramway.

Our conclusion is that the verdict in the sum rendered is not supported, and that a new trial should be awarded.

Order reversed and a new trial granted.