[Civ. No. 4100.    First Appellate District, Division Two.—February 24, 1922.]

## PURITAS COFFEE & TEA COMPANY (a Corporation), Appellant, v. L. DE MARTINI et al., Respondents.

[1] SALES — PURCHASE THROUGH BROKER — ACTION FOR PURCHASE PRICE—EVIDENCE.—In an action for goods sold to defendant, who dealt only with a broker and not with plaintiff directly, communications passing between plaintiff and its representatives and such broker, but not shown to have been communicated to defendant, are properly excluded.

[2] ID.—AGREEMENT BETWEEN DEFENDANT AND BROKER—ABSENCE OF AUTHORITY—EVIDENCE.—In such action, it being indisputably shown that the defendant dealt with such broker and with no one else in negotiating for and ordering the goods, the defendant is entitled to show the agreement made, notwithstanding the plaintiff repudiates the authority of such broker to represent it.

[3] ID.—SHIPMENT—DELIVERY ON PAYMENT OF DRAFT—RESERVATION OF TITLE—EVIDENCE.—The fact that a bill of lading is made to the order of the seller, with instructions to notify the buyer, and that it is forwarded with sight draft attached to a bank at the point of destination authorized to deliver to the buyer only upon payment of the draft, clearly evidences an intention on the part of the seller to reserve title and possession until payment of the draft.

[4] ID.—CASH SALE—PASSING OF TITLE—RISK OF LOSS.—When the terms of sale are cash, title does not pass until payment of the price; and in the absence of an agreement to the contrary, the risk of loss is assumed by the party having the title.

[5] ID.—RELATION OF PAYMENT TO DELIVERY.—When nothing is said when the order is given as to the time of payment, delivery of the goods and payment of the price are deemed to be concurrent acts.

[6] ID.—LETTER TO SELLER — OMISSION OF TERMS—WAIVER OF PERFORMANCE.—Where a letter from the buyer to the seller does not purport to set forth in full the agreement entered into between the buyer and the agent of the seller, but only deals with the

3. Passing of title to consignee on delivery to carrier as affected by bill of lading and attachment of draft thereto, notes, 5 **Ann. Cas.** 263; 2 **L. R. A. (N. S.)** 79.

Passing of title by delivery f. o. b., notes, 62 **L. R. A.** 802; 33 **L. R. A. (N. S.)** 54.

method of payment, the failure to mention other terms does not amount to a waiver of performance as to them.

[7] ID.—ADOPTION OF UNAUTHORIZED CONTRACT—LIABILITY TO BURDENS.—Although a seller cannot be bound by the terms of a contract of sale made by its agent, if unauthorized, and might refuse to deliver the goods, where it delivers the goods to the buyer, with full knowledge of the circumstances and conditions under which they were ordered, it will be held to have adopted the contract, subject to its burdens as well as its benefits.

[8] ID.—SALE BY SAMPLE—RIGHTS OF BUYER.—Where a sale is one by sample, an opportunity to inspect the goods to ascertain whether or not they are in conformity with those ordered is a condition precedent to the buyer's obligation to pay for them, and if they are not the buyer is entitled to reject them and to refuse payment.

[9] ID.—REMOVAL OF GOODS TO PLACE OF BUSINESS — WHEN RIGHTS NOT WAIVED.—Where goods are sold by sample, the removal of the goods from the railroad station to the place of business of the buyer for the purpose of inspection does not constitute a waiver of that right or an acceptance of the goods, where lack of facilities renders inspection at the railroad station impossible.

[10] ID.—PROMPT EXAMINATION—RIGHT OF REJECTION—REFUSAL OF PAYMENT.—Where, upon removal of such goods from the railroad station to the place of business of the buyer, they are promptly examined and found to be defective, inferior to sample, and totally unfit for the purpose for which they were ordered, or for any other purpose, the buyer is entitled to reject the goods and refuse payment.

[11] ID.—DELIVERY OF GOODS UNDER MUTUAL MISTAKE — RIGHT OF REJECTION.—Assuming that there was no contract of sale at all because there was no meeting of the minds of the parties and that the goods were delivered under a mutual mistake of fact, the buyer was not obligated to keep and pay for the goods, where he acted promptly in the matter of their rejection.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   John Hunt, Judge.   Affirmed.

The facts are stated in the opinion of the court.

8. Right of buyer to inspection of goods at destination, under f. o. b. contract, note, 16 Ann. Cas. 1201.

Ward Chapman and L. M. Chapman for Appellant.

Daniel A. Ryan for Respondents.

NOURSE, J.—Plaintiff appeals from the judgment follow-ing verdict in favor of defendants in this action to recover the purchase price of shelled walnuts.

The complaint alleged that, on January 15, 1919, plaintiff contracted to sell to defendants and defendants contracted to purchase of plaintiff 5,507 pounds of broken pieces of walnut meats and 5,002 pounds halves of walnut meats then owned and in the possession of plaintiff, at Los Angeles, at a price of forty cents per pound, or a total of $4,203.60, f. o. b. Los Angeles, and plaintiff agreed to make delivery thereof to defendants by loading the same on board the cars at Los Angeles, consigned by rail to defendants at San Francisco, payment of the whole of the purchase price to be made upon presentation of sight draft therefor to defend-ants at San Francisco; that defendants refused to accept or pay the draft when presented, but agreed on or about said date that if plaintiff would deliver to defendants the bill of lading so that defendants might obtain delivery of said shipment, defendants would immediately upon the arrival of the car pay the purchase price to plaintiff; that the car arrived and the goods were accepted and received by defendants, but that they refused to pay the purchase price or any part thereof. The complaint contained a second count that, on or about January 21, 1919, defend-ants became indebted to plaintiff for goods, wares, and mer-chandise purchased from plaintiff of the reasonable value of $4,203.60. Defendants' answer admitted the making of the contract, on January 15, 1919, for the quantity and at the price alleged in the complaint, but denied that the payment of the whole or any part of the purchase price of the walnuts was to be made upon presentation of sight draft, or any draft therefor, and also denied that plaintiff made delivery to them of the walnut meats on board cars at Los Angeles, consigned to defendants at San Francisco, and also denied the allegations of the second count, above referred to. They set up by way of defense that they had refused to accept or pay for the walnuts because (1) the goods were sold by sample and the walnut meats shipped were not in

accordance with the sample, but were different from and inferior thereto; (2) that the walnuts which defendants agreed to buy were to be sweet and merchantable, but that the walnuts shipped were bitter and unmerchantable, and (3) that they were rancid and wormy and unfit for human consumption.

There was no formal contract and the difference between the parties regarding its terms is due to the fact that defendants' negotiations for the purchase of these nuts were all had with one Ranniger, a broker in San Francisco, whose authority to represent it plaintiff repudiates. Ranniger was not a witness in the action, being out of the country at the time of the trial. [1] It was admitted, however, that neither plaintiff, plaintiff's Los Angeles brokers, nor the latter's San Francisco correspondent, had directly communicated with defendants or had any negotiations whatever with them. Consequently all evidence relating to conversations or communications passing between these parties and between plaintiff's San Francisco representative and Ranniger, with whom plaintiff claims the latter dealt as defendants' representative, and all instructions to them, which it was not shown were communicated to defendants, were properly excluded. On the other hand, defendants were permitted to show their agreement with Ranniger. L. De Martini, the partner who conducted this transaction for defendants, insisted on the trial that Ranniger was not defendants' agent, and there was no evidence tending to prove any such relation. [2] It was indisputably shown that defendants dealt with Ranniger and with no one else in negotiating for and ordering these goods, and that thereafter plaintiffs shipped the walnuts to them. L. De Martini also testified that all his negotiations with Ranniger were oral and that he never submitted to Ranniger any offer or statement in writing concerning any transaction and Ranniger never submitted to him any writing, either correspondence or otherwise, in connection with any of these transactions. Ranniger being the only person with whom defendants made any agreement regarding the nuts in suit, they were entitled to show this. While plaintiff could not be bound by an unauthorized agreement without a subsequent ratification, neither could plaintiff impose upon defendants terms to which they had not consented. L. De Martini testified that about the first

of November, 1918, Ranniger solicited him for an order for walnut meats; that he stated he was representing somebody in the south, but did not mention the name, and produced two samples, halves and pieces, which were white, sound, sweet, merchantable walnut meats; that he said they were from the new crop, that there was no more old crop; that he (De Martini) then requested Ranniger to send a sample of about 100 pounds of each, halves and pieces, stating, "if they are the same as the sample I will take the lot"; that Ranniger consented and, on December 24, 1918, plaintiff shipped this order to defendants at sixty cents for halves and fifty-eight cents for pieces, sending their invoice for same; that these were sweet, sound, merchantable nuts; that, on account of a delay in shipment, it was then too late to get the balance for use for the holiday trade; that defendants, therefore, on December 31, 1918, sent check direct to plaintiffs covering the December 24th invoice, with a letter stating: "Please do not ship any more, as we cannot use them. The best we could have used them near the price you are asking, was before the Holidays, and that trade is giving to other commodities, as all commodities are dropping pretty fast. If you have a better offer to make for the lot, let us know." This was the only direct communication with plaintiff, or anyone else other than Ranniger, and L. De Martini testified he later agreed with Ranniger upon forty cents a pound, and that Ranniger told him the nuts were new, sweet, sound and merchantable.

On January 21, 1919, plaintiff shipped the nuts, the price of which is the subject of this action. The goods were consigned to the order of plaintiff at San Francisco with instructions in the bill of lading to "notify L. De Martini Co." Plaintiff indorsed the bill of lading in blank and forwarded it, with sight draft attached, to a San Francisco bank with instructions to deliver to defendants upon payment of draft. Defendants refused to pay the draft, stating to the bank that they had never agreed to pay a draft and that they wished to inspect the goods before paying for them. It then became evident that there was a misunderstanding regarding the terms of the contract. Plaintiff's brokers in Los Angeles, on January 25, 1919, wrote to defendants, urging them to pay the draft, stating that they had confirmed the order mentioning that the terms were

"sight draft with B/L attached, payable on presentation."
The evidence, however, was that these terms were never com-
municated to or accepted by defendants. February 4, 1919,
defendants replied: " . . . In reference to the Walnut Meats
there is no misunderstanding. We are prepared to take
the Walnut Meats but not against sight draft. . . . " Other
matter followed relating to their prejudice against drafts,
and the names of certain business people were mentioned to
be used for references regarding their financial responsibil-
ity, but nothing was said about inspection, and the letter con-
cluded: "Now it is an option to yourself, whether you want
to ship or not. We will pay for same as soon as we receive
them." Upon receipt of that letter and, as plaintiff's presi-
dent, Mr. Glascock, testified, in reliance upon this promise
of payment upon receipt of the goods plaintiff authorized
the release of the bill of lading without payment of the
draft. Defendants had them taken from the railroad com-
pany's possession about February 14, 1919, to their place
of business, as L. De Martini testified, for examination, be-
cause there were not the facilities at the former place for
opening and properly examining a shipment of this kind.
Upon inspection they found them to be unmerchantable,
many of them being decayed and wormy and full of weevil.
It is admitted that they were cold-storage nuts from the
old crop. Defendants promptly notified plaintiff that be-
cause of their condition they would not accept the nuts and
asked for instructions regarding their disposition. Plaintiff
disclaimed ownership and declined to give any instructions
regarding their disposition. They remained in defendants'
possession, where they were examined and quarantined a
few weeks later by the pure food inspector and thereafter
condemned and destroyed. Both parties insist that it was
not intended by releasing the bill of lading without payment
of the draft to extend credit, but was understood and agreed
at that time that the terms were to be cash, payment to be
made upon defendants' receipt of the goods, although to sup-
port a directly opposite position, plaintiff also argues that
the sale was on credit.

Appellant raises no point on appeal regarding the condi-
tion of the nuts in view of the verdict and the state of
the evidence, but assumes that a substantial part of them
were in bad condition when received at defendants' place of

business. The question here is whether defendants were entitled to reject the walnuts or, as plaintiff asserts, were liable for the price regardless of their damaged condition. On the trial appellant's theory of the case was that the goods were sold to the defendants f. o. b. cars at Los Angeles, examination and inspection there, that the title passed to the defendants at the time the goods were loaded on the cars, that all risks of deterioration in transit were assumed by the purchaser, that they were to pay for these goods upon presentation of sight draft without awaiting the arrival of the goods, and that they had waived the right of inspection. The theory that delivery to defendants was accomplished by loading on the cars at Los Angeles and that at that point of time title passed to defendants, they then assuming all risk of deterioration in transit, has been practically abandoned by plaintiff on appeal. Plaintiff also concedes defendants' claim that they never agreed to examine and accept the goods at Los Angeles. There was an entire failure of proof to establish this theory. [3] On the contrary, the fact that the bill of lading was made to the order of plaintiff, with instructions to notify defendants, and that it was forwarded with sight draft attached to a San Francisco bank authorized to deliver to defendants only upon payment of the draft, clearly evidenced an intention on the part of plaintiff to reserve title and possession until payment of the draft. [4] When the terms are cash, title does not pass until payment of the price. (*People* v. *Sing*, 42 Cal. App. 385 [183 Pac. 865, 867]; *Katzenbach & Bullock Co.* v. *Breslauer*, 51 Cal. App. 756 [197 Pac. 967, 968].) And in the absence of an agreement to the contrary, the risk of loss is assumed by the party having the title. (*Henderson* v. *Lauer & Sons*, 40 Cal. App. 696, 698 [181 Pac. 811]; *Potts Drug Co.* v. *Benedict*, 156 Cal. 322, 334 [25 L. R. A. (N. S.) 609, 104 Pac. 432].)

It may be that plaintiff did not authorize Ranniger to contract with defendants. However, both parties believed there was a valid contract between them, and plaintiff and defendants both acted on this assumption. This being true, it seems unlikely that defendants' letter of February 4th was intended by them as an offer to supersede the agreement made with Ranniger by another and different arrangement. It seems rather to have been written in reliance on that

agreement. **[5]** Nothing was said when the order was given as to time of payment, in which event delivery of the goods and payment of the price are deemed to be concurrent acts. (*Blackwood* v. *Cutting Packing Co.*, 76 Cal. 212, 215 [9 Am. St. Rep. 199, 18 Pac. 248]; *Gilfallan* v. *Gilfallan*, 168 Cal. 23, 29 [Ann. Cas. 1915D, 784, 141 Pac. 623]; *United Canneries Co.* v. *Seelye*, 48 Cal. App. 747 [192 Pac. 341, 342].) The statements, then, in this letter: "In reference to the Walnut Meats there is no misunderstanding. We are prepared to take the Walnut Meats but not against sight draft" and "We will pay for same as soon as we receive them," might reasonably have meant no more than that they were willing to perform in accordance with the terms of the contract. **[6]** The letter does not purport to set forth the agreement in full. It does not, for instance, mention quantity or price—although the quantity bargained for with Ranniger was shipped and at the price agreed—but deals only with the method and time of payment. Under the circumstances a failure to mention other terms would not amount to a waiver of performance as to them. **[7]** Plaintiff could not have been bound by these terms, if unauthorized, and might have refused to deliver the goods. But it consented to them, delivered the bill of lading and permitted defendants to take the goods from the carrier without payment of the price, which it then attempted to collect. If this was done with full knowledge of all the circumstances and conditions under which defendants had ordered the goods it amounted to an adoption of the contract by plaintiff, which it would take subject to its burdens as well as its benefits. There is evidence that plaintiff recognized that the agreement was one for sale by sample. The brokers referred to the subject in their letter written to defendants urging them to pay the draft, stating: "These nuts run infinitely better than the sample that was submitted to you." Plaintiff's Mr. Glascock testified: "We packed five barrels or five drums of these walnut meats and sent them up there as a sample, with negotiations for the entire lot, and they were received by the De Martini Company." The question whether or not the sale was one by sample was submitted to the jury under proper instructions. "One who sells or agrees to sell goods by sample, thereby warrants the bulk to be equal to the sample" (Civ. Code, sec. 1766); and "on an

agreement for sale, with warranty, the buyer has a right to inspect the thing sold, at a reasonable time, before accepting it. . . . '' (Civ. Code, sec. 1785.) **[8]** Assuming the jury concluded that plaintiff did adopt the contract purported to have been made for them by Ranniger with defendants, an opportunity to inspect the goods to ascertain whether or not they were in conformity with those ordered was a condition precedent to defendants' obligation to pay for them. If they were not, defendants were entitled to reject them and to refuse payment. (*Newmark & Co.* v. *Smith,* 26 Cal. App. 339 [146 Pac. 1064].) **[9]** Appellant insists that defendants waived their right to inspect by failure to do so prior to removing them from the carrier's possession. De Martini testified that the goods were hauled to defendants' establishment for the purpose of inspection because it was impossible to examine them at the railroad station—that there were not the facilities for properly examining a shipment of this character there—that the walnut meats were packed in small barrels or fiber containers, fifty-nine in all. While the proof was not very full on this subject, it cannot be said that the jury were not entitled to conclude that inspection at the station was impossible. If so, removing the goods to their place of business for that purpose did not amount to a waiver of the right or an acceptance of the goods. (*Wall Rice Milling Co.* v. *Continental Supply Co.,* 36 Utah, 121 [140 Am. St. Rep. 815, 103 Pac. 242].) **[10]** The goods were promptly examined, and as heretofore stated, found to be defective, inferior to the sample, and totally unfit for the purpose for which they were ordered, or for any other purpose. Under these circumstances defendants were entitled to reject the goods and to refuse payment.

**[11]** Assuming that there was no contract at all because there was no meeting of the minds of the parties and that the goods were delivered under a mutual mistake as to the facts, then clearly defendants were not obligated to keep and pay for the goods, they having acted promptly in the matter.

For the reasons given the judgment is affirmed.

Langdon, P. J., and Sturtevant, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 24, 1922.

All the Justices concurred.

Waste, J., was absent and Richards, J., *pro tem.*, was acting.