[Civ. No. 4652. First Appellate District, Division One.—April 30, 1924.]

COATS & WILLIAMSON, INC. (a Corporation), Respondent, v. MORAN & CO. (a Corporation) et al., Appellants.

[1] SALES—PURCHASE OF HAY—CONVERSION—FINDINGS—EVIDENCE.— In this action for the conversion of certain hay, the evidence was sufficient to sustain the findings of the trial court to the effect that the persons whom the owner directed to store the hay were not authorized to sell it; that said persons retained possession thereof merely as caretakers; that the firm to which they purported to sell the hay did not purchase the hay upon the faith of any authorization from plaintiff to their alleged vendors to sell same; that said firm had knowledge that the hay was the property of plaintiff; and that said firm did not purchase the hay in good faith or in the ordinary course of business.

[2] ID.—POSSESSION WITH POWER TO SELL—BONA FIDE PURCHASE— EVIDENCE.—In such action, before the provisions of section 1142 of the Civil Code were available to defendants, it was necessary for them to establish that a transfer of the possession of said hay was made by plaintiff to the persons whom plaintiff had directed to store the hay, accompanied by the power to dispose of the same, and that the firm to whom they purported to sell the hay purchased it in good faith and in the ordinary course of business; and the evidence failed to prove either proposition.

[3] ID. — QUOTATION OF PRICE — AUTHORITY TO SELL — DELAY IN ACCEPTING OFFER.—A letter from the representative of the owner to the persons who had been directed to store the hay, in reply to an inquiry by the latter, as to the price of said hay did not constitute an authorization to sell the hay; but even if such letter be construed as a grant of authority to sell the hay at the price stated therein no valid sale was made thereunder where the offer of the hay at the price stated was not accepted within a reasonable time; and waiting over two weeks without replying did not constitute acceptance within a reasonable time where the hay market at that time was on the rise.

[4] ID.—JOINT LIABILITY OF CARRIER.—In such action, the evidence showing that the defendant who was in charge of the barge

2.  See 24 R. C. L. 391.
3.  See 6 Cal. Jur. 55; 6 R. C. L. 609; 23 R. C. L. 1284.
4.  See 26 R. C. L. 1137.

upon which the hay was transported from the place where it had been stored had notice of the adverse claim of title to said hay by plaintiff, coupled with the fact that said defendant thereafter removed said hay and transported it to the warehouse of his codefendant, was sufficient to charge said defendant with joint liability for the conversion of the hay.

[5] Id.—Value—Judgment—Diligence—Findings.—In an action for conversion, in order to support a judgment for the highest market value between the date of the conversion and the date of the judgment, it is essential that there be a finding to the effect that the action has been prosecuted with reasonable diligence.

[6] Id.—Findings—Erroneous Judgment—Appeal—Modification.— In an action for conversion, where the court makes two findings, one showing the value of the property at the date of conversion and the other showing the highest market value between that date and the date of the judgment, and, although it fails to find that the action has been prosecuted with reasonable diligence, gives judgment for the highest market value, it is not necessary, on appeal, to reverse the judgment, but the error may be cured by directing the entry of judgment for the value of the property at the date of conversion, with interest.

(1) 4 C. J., p. 877, sec. 2853.    (2) 35 Cyc., p. 357.    (3) 2 C. J., p. 954, sec. 727; 13 C. J., p. 297, sec. 111; 35 Cyc., p. 53.    (4) 38 Cyc., p. 2054.    (5) 35 Cyc., p. 365.    (7) 4 C. J., p. 1159, sec. 3170.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   F. J. Murasky, Judge. Modified and affirmed.

Hankins & Hankins and Olin F. Nuckolls for Appellants.

Lucius L. Solomons and Fred C. Peterson for Respondent.

KNIGHT, J.—This is a joint appeal by the defendants from a judgment rendered against them in the sum of $2,769.50 and costs for the alleged conversion of ninety-five and one-half tons of hay.

During the month of October, 1919, the hay in question was stored in a barn on an island near Vallejo, of which C. R. Windeler and S. Benson at that time had control. On November 8, 1919, Windeler & Benson made a purported

5.   See 26 R. C. L. 1148.
6.   See 2 Cal. Jur. 987; 2 R. C. L. 278.

sale of said hay to Goss & Son. On November 13, 1919, Goss & Son sold the hay to the defendant Moran & Co. Within a few days thereafter Moran & Co. shipped the hay on a barge under the control of defendant Erickson from said island to its warehouse located in South San Francisco.

The appellants claim a valid sale of said hay to Goss & Son under the provisions of section 1142 of the Civil Code upon the ground that Windeler & Benson at the time of said purported sale were in possession of said hay under authority to sell the same granted by plaintiff through its representative Lucius L. Solomons, and that Goss & Son, relying upon the authority thus granted, purchased said hay from Windeler & Benson in good faith and in the ordinary course of business.

[1] The trial court found that Windeler & Benson were not authorized to sell said hay; that they retained possession thereof merely as caretakers; that Goss & Son did not purchase said hay upon the faith of any authorization from plaintiff to Windeler & Benson to sell the same and they had knowledge that said hay was the property of plaintiff and that they did not purchase the same from Windeler & Benson in good faith or in the ordinary course of business.

Appellants attack these findings upon the ground that they are not supported by the evidence. We find no merit in the contention.

It appears from the evidence that in October, 1919, Windeler & Benson took possession of an island near Vallejo known as Island No. 2, under a contract of purchase for the purpose of farming the same. The hay in question was grown on said island during the year 1919 by former tenants under a crop lease and said hay constituted the one-fourth share belonging to plaintiff. Owing to certain financial difficulties in which said former tenants became involved, the entire crop of hay could not be sold as a whole as had been the usual custom, and consequently the one-fourth share belonging to plaintiff was left in the field. The condition of the weather at that time had been threatening and for that reason Lucius L. Solomons, who had been acting as the attorney for plaintiff, wrote Windeler & Benson on October 13, 1919, as follows: ''(You) are hereby au-

thorized to furnish the necessary labor to haul and protect the hay belonging to the undersigned at Island No. 2, the same to be placed on the levee or elsewhere awaiting sale or shipment according to their discretion and at our expense.'' The hay was accordingly hauled to and stored in the barn on said island by Windeler & Benson. They also had a quantity of hay stored therein belonging to themselves.

About that time Solomons planned a trip east and in contemplation of his absence requested a hay broker named Eaton to dispose of plaintiff's hay at the highest market price. Before his departure, however, Solomons received a letter from Windeler dated October 22, 1919, as follows: ''If Mr. Williamson's hay is for sale, would you please let me know his price as soon as possible.'' In a reply letter dated October 24, 1919, Solomons stated ''that the price of Mr. Williamson's hay is $13.50 per ton delivered at the barn on Island No. 2, where your men have recently hauled it, I believe.'' Solomons departed for the east on October 29, 1919, and did not return until the end of the following month. During his absence, to wit, on November 8, 1919, Benson, unknown to Windeler, made a purported sale of said hay to Goss & Son. Two days later, on November 10, 1919, Windeler wrote to Solomons stating ''we will take that hay of Williamson's at $13.50 per ton. We will pay for it as soon as we get the weight of it.'' The Windeler letter of November 10, 1919, was shown to Eaton by Solomons' stenographer and Eaton thereupon in Solomons' absence dictated and mailed a reply in Solomons' name, in which it was stated ''since I heard nothing from you in reply to my letter the hay has been sold some two weeks or more.'' As a matter of fact, said hay had not been sold, but as Eaton explained while testifying, the statement in said letter related to a transaction in which he and another hay broker had inspected the hay and indicated they would buy it. This circumstance, however, is immaterial.

It is principally upon the authority of the Solomons letters, dated October 13, 1919, and October 24, 1919, respectively, and the fact that Windeler & Benson had possession of the hay, that appellants base their claim of a valid sale to Goss & Son under the provisions of section 1142 of the Civil Code.

[2]    Before the provisions of said code section are available to appellants, however, it is apparent that two propositions must be established by the evidence. First, a transfer of the possession of said hay by plaintiff to Windeler & Benson accompanied by the power to dispose of the same, and, secondly, a purchase by Goss & Son in good faith and in the ordinary course of business. The evidence, we think, fails to prove either proposition.

[3]    From the testimony given by Solomons it is quite clear that Solomons' only purpose in requesting Windeler & Benson to "haul and protect said hay" was to save it from the elements and it is evident from the face of his letter of October 24, 1919, that said letter was not intended as an authorization to dispose of said hay, but as Solomons testified, was written merely as a reply to an inquiry made by Windeler as to the price of said hay. Even if said letter be construed as a grant of authority to sell said hay to others at the price stated therein there was no valid sale made thereunder for the reason that the offer of the hay at that price was not accepted within a reasonable time. (Subd. 2, sec. 1587, Civ. Code.) "In mercantile contracts such as contracts for the manufacture or sale of goods and the like, it is generally held that the parties have intended that the time is the essence of the contract. (13 Corpus Juris, 688, and cases cited.)" (*Jensen* v. *Goss,* 39 Cal. App. 427 [179 Pac. 225].) And even in cases where time is not the essence of the contract, acceptance must be made within a reasonable time and the question of "what is a reasonable time must be determined from all the circumstances of the individual case. (Mechem on Sales, sec. 1129, 30–32 and 33.)" (*Martyn* v. *Western Pacific R. R. Co.,* 21 Cal. App. 589 [132 Pac. 602].) Appellants concede that the hay market at that particular time was on the rise. Windeler & Benson waited over two weeks before making reply. Their acceptance, therefore, came too late.

Appellants make no claim that Windeler & Benson were ever the owners of said hay. Their whole case rests upon the theory that they were vested only with a selling power as defined by section 1142 of the Civil Code. It is therefore unnecessary to discuss the question of whether or not Windeler & Benson actually became the owners of said hay.

Upon the second proposition we think that the trial court was fully justified in finding that the purchase by Goss & Son was not made in good faith. The evidence shows that Windeler & Benson were desirous of having the hay disposed of so that they could use the barn for other purposes. The purported sale of November 8, 1919, to Goss & Son was consummated through a representative named Lewis. He was first told that the hay was for sale by Windeler while visiting at the home of Lewis in Concord. Later Lewis inspected the hay at the barn on the island. At that time Windeler told him that he "had no authority to sell Mr. Williamson's hay" and he gave Lewis the address of Solomons and made the request that he communicate with him. Benson on this same occasion requested Windeler to write to Solomons about the sale of the hay. This request resulted in Windeler's letter of October 22, 1919. Lewis again visited the island some time during the first week in November. At that time he was shown Solomons' letter dated October 24, 1919, in which it was stated that the price of the hay was $13.50 a ton. Windeler had demanded $15 per ton, but explained that the extra amount covered the charges for hauling and storing the hay. Lewis went away without purchasing the hay for the reason that Goss had limited him to a buying price of $13.50 per ton. After communicating with Goss the latter instructed him to buy the hay if it was good stock hay.

A few days later, on November 8, 1919, in Pacheco, in the absence of Windeler, Lewis purchased from Benson the entire lot of hay in the barn, consisting of 1,400 bales, 900 of which belonged to plaintiff. The sale was evidenced by a written bill of sale signed by Benson in which Windeler & Benson were named as vendors and Goss & Son as vendees. Upon Benson's return to the island two days thereafter he informed Windeler of the sale and requested him to write to Solomons and say "we would take the hay at that price." Windeler accordingly wrote the letter of November 10th above quoted.

While Lewis was carrying on his dealings with Windeler & Benson, Goss opened negotiations with Eaton. He first phoned Eaton to inquire the price of said hay and upon being told that the price was $20 per ton declined to take it. A few days later he again phoned Eaton and said "Now

let's get down to business, what will you take for that Coats & Williamson hay up there on Island No. 2,'' to which Eaton again replied that the price was $20 a ton. After some discussion Goss ended the conversation by saying that he did not want the hay ''at that money.'' Following that conversation Eaton, together with another hay broker, inspected the hay on the island with a view of buying it themselves. Upon his return to San Francisco, Goss again phoned Eaton to inquire the price of the hay and Eaton told him then that the price was $25 per ton. The following conversation then took place between them: ''He (Goss) said, 'What are you holding that hay at?' I said, '$25.' He says, 'Well, I don't want to pay for it; that is out of reason.' And he said, 'I will tell you what I want to know for. Through a mistake our man has loaded 600 bales of that hay on the barge, and it is on the road to San Francisco,' or 'ready to leave for San Francisco.' And he says, 'I offered $15 for it the other day; I will give $17.50 for it now.' I told him 'no, that I wouldn't take it,' and I told him 'Without he was ready to give the price, he could put the hay back in the warehouse.' He said, 'Well, I will put it back, but I won't put it in the warehouse.' I said, 'You will get in serious trouble if you don't put it where you found it. You got that hay in the warehouse, and I want it put back in the warehouse where you got it.' He said, 'All right,' he would notify Captain Peterson to put it back in the warehouse.''

Immediately following that conversation Eaton phoned to the defendant Erickson to ascertain if he had yet moved the hay and the following conversation, according to Eaton, took place between them: ''I (Eaton) called up Captain Erickson, and asked him if he had removed that hay, and he said, 'There is 600 bales of it on the barge.' 'Well,' I said, 'Mr. Goss tells me that he has ordered it to be put back.' 'Well,' he says, 'Mr. Goss may have told you that, but he has just told me—I got word from him a few minutes ago, that he sent an extra man up there to hurry up and load the balance of that hay and get it down to San Francisco.' '' The testimony given by Eaton concerning these phone conversations was not denied and in our opinion fully support the conclusions of the trial court upon the

question of the good faith of the purchase by Goss & Son from Windeler & Benson.

Appellants also contend that the evidence is insufficient to support the finding of the trial court to the effect that while Solomons represented himself to be the agent of the plaintiff in reference to the selling of the hay, he did not have the authority to sell the same and that plaintiff was not bound by his acts in that respect. We believe that the evidence supports the finding, but inasmuch as Solomons did not transfer said hay to Windeler & Benson with the power of selling the same it becomes unnecessary to discuss the question of the real or ostensible authority of Solomons.

[4] Appellants also claim that the evidence is insufficient to charge the defendant Erickson with liability. It is evident, we think, from the testimony given by Eaton concerning the conversation over the phone with Erickson, which occurred prior to the time that any hay was removed from said island, that sufficient notice was given Erickson of the adverse claim of title to said hay by plaintiff, and coupled with the fact that Erickson thereafter removed said hay from the island and transported it to the warehouse of Moran & Co. was sufficient to charge him with joint liability for the conversion of the hay.

The last contention of appellants to be considered is the one wherein it is claimed that the findings are insufficient as a matter of law to support the judgment. This contention is based upon the ground that there is no finding, either express or implied, to the effect that . . . "the action has been prosecuted with reasonable diligence." (Sec. 3336, Civil Code.)

The complaint alleged, and the court found, that the conversion was committed on November 19, 1919. The action was commenced on December 23, 1919, but was not tried until the 4th and 11th days of October, 1920, and the findings were not signed until February 19, 1922. Judgment was entered on February 14, 1922. Plaintiff in the complaint elected "to claim the highest value of said property from the time of said conversion to the date of the judgment in the action" and in this respect alleged that the highest market value between the date of the conversion and the date of the filing of the complaint was $2,500. The court made two separate findings on the issue of the market

value of said hay. It found, first, that the market value thereof on the date of the conversion was $1,757, and it found secondly that the highest market value between the date of the conversion and the date of the judgment was $2,769.50, or $29 per ton. Judgment was given for the latter amount.

[5] We are of the opinion that in order to support the judgment for the greater amount it was essential that there be a finding to the effect that the action has been prosecuted with reasonable diligence. (Sec. 3336, Civil Code.) In the case of *Niles* v. *Edwards,* 90 Cal. 10 [27 Pac. 159], it was said: "We could, perhaps, say as a matter of law, that the action was commenced in time to entitle the plaintiff to the benefit of the rule allowing the highest market value, but a whole year having elapsed between the commencement of the action and the trial, it cannot be concluded as a matter of law that it was prosecuted with due diligence. It may have been or it may not have been so prosecuted, and without an express finding in his favor on this point, the plaintiff is not entitled to a judgment based on the highest market value." Respondents endeavor to escape the effect of the ruling stated in that case by advancing the claim that the defendants by their answers tendered no issue on that point and that consequently no finding was necessary. There are two answers to respondent's theory: First, in the very nature of things it would be quite impossible for a defendant in any case to plead such fact in advance for the reason that the lack of diligence on plaintiff's part may not then have occurred, and secondly, where a judgment is obtained for a greater amount than is called for by the ordinary measure of damages the record must affirmatively show sufficient proof and findings to justify the allowance of such greater amount. [6] We are satisfied, however, that the error may be cured by a modification of the judgment (*Brown* v. *Caldwell,* 13 Cal. App. 29 [108 Pac. 874]), and that it will not be necessary to reverse the judgment as was done in the case of *Niles* v. *Edwards, supra,* for the following reasons: In the latter case there was but one finding upon the issue of value—the highest market value between the date of the conversion and the date of the judgment. It was held that the absence of a finding as to the use of reasonable diligence prevented the application of the meas-

ure of damages for the greater amount. Consequently the record was left barren with no finding whatever on the issue of value, and without which no judgment could be rendered. A retrial was therefore necessary to determine, first, whether diligence had been used, and if so, then to again give judgment for the greater amount, but it found that reasonable diligence had not been used, then to determine the market value of the property at the time of conversion so that judgment might be given for the lesser amount.

In the instant case the decision as above stated contains two findings on the issue of value. Like the case of *Niles* v. *Edwards, supra,* the absence of a finding as to the use of reasonable diligence has eliminated the measure of damages for the greater amount, but unlike that case, there still remains the finding of reasonable market value of the property on the date of the conversion. Consequently there is a complete set of findings to support a judgment for the lesser amount which respondent in its brief has intimated it is willing to accept. Appellants could not possibly expect to be benefited by a retrial. It could result only in possible advantage to the respondent, for the reason that the only issue to be tried would be the question of the use of reasonable diligence in the prosecution of the action. If the court found that such diligence had been exercised it would again apply the measure of damages for the greater amount. If it found that such diligence had not been used, it would then apply the measure of damages for the lesser amount, which, as before stated, respondent has intimated it is now willing to accept.

It is therefore ordered that the trial court enter a judgment on the findings in favor of plaintiff for the sum of $2,030.30, that being the market value of said property as found by the court on the date of the conversion with the added interest at seven per cent per annum from the date of the conversion to the date of the entry of said judgment, and that the entry of such judgment be made *nunc pro tunc* as of the date of the original judgment, the fourteenth day of February, 1922, and as thus modified the judgment will stand affirmed. It is further ordered that appellants recover costs of this appeal.

Tyler, P. J., and St. Sure, J., concurred.