[Civ. No. 5063.  First Appellate District, Division One.—April 28, 1926.]

## C. O. BASHAW CO. (a Corporation), Respondent, v. A. U. PINKHAM CO., INC. (a Corporation), Appellant.

[1] SALES—RIGHT OF INSPECTION—REASONABLE TIME—WAIVER.—Where the buyer is required to exercise the right to inspect the goods purchased and to accept or reject the goods within a reasonable time after the same are tendered, and he fails to exercise such right within a reasonable time after tender, the seller is justified in canceling the sale and the buyer cannot recover damages.

[2] ID.—REASONABLE TIME—EVIDENCE—WHEN QUESTION OF LAW.— What constitutes a reasonable time in such case is usually a question of fact and must be determined from all the circumstances of the individual case, but where the facts are not disputed or the matter can be ascertained from the language of the contract, it may be determined as a matter of law; and in mercantile contracts, or where the character of the property is likely to fluctuate in value, it is generally held that the parties have intended to make time the essence.

[3] ID.—SALE OF PEANUTS—DELAY IN MAKING INSPECTION—CANCELLATION OF SALE.—In this action for damages for alleged breach by the seller of a contract for the sale of peanuts, it having been shown that, after tender of the peanuts, plaintiff delayed four days before making any effort to obtain an inspection of the same, and although it received favorable reports afterward from its inspectors as to the quality of the peanuts, did not indicate up to the morning of the eighth day whether it would accept or reject the goods, but at that time made arrangements for the taking of other samples which would of necessity consume additional time, the conclusion was inevitable that plaintiff did not exercise its right of acceptance of the goods within a reasonable time and that defendant was justified in canceling the sale.

[4] ID.—SALE BY SAMPLE—WARRANTY OF BULK—ADDITIONAL GUARANTEES.—After plaintiff had approved the samples and agreed to buy the goods and defendant had tendered same in accordance with plaintiff's directions, which tender carried with it an implied warranty that the bulk was equal in quality to the samples,

1.  See 23 R. C. L. 1434.
2.  See 6 Cal. Jur. 356; 23 R. C. L. 1330.

defendant was relieved of any further duty in the matter and he was not obligated to furnish plaintiff with certificates or guarantees as to quality.

(1) 35 Cyc., p. 227, n. 47, p. 229, n. 58.   (2) 13 C. J., p. 688, n. 54, p. 791, n. 71, 72.   (3) 35 Cyc., p. 229, n. 58.   (4) 35 Cyc., p. 405, n. 54.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Franklin A. Griffin, Judge. Reversed.

The facts are stated in the opinion of the court.

Perry Evans for Appellant.

Norman A. Eisner for Respondent.

KNIGHT, J.—This is an appeal by defendant from a judgment awarding plaintiff damages in the sum of $731.-50 and costs for an alleged breach of contract for the sale of peanuts.

It appears that on September 7, 1923, C. O. Bashaw Co., the respondent, with offices in San Francisco, agreed to buy from A. U. Pinkham Co., the appellant, which operates in Seattle, 770 bags of Chinese shelled peanuts in bond to be delivered out of a warehouse in Seattle. The sale was negotiated through a brokerage firm in San Francisco named Lilienthal-Williams Co., hereinafter referred to as agents; and it was stipulated during the trial that all communications from said agents to respondent be considered as communications from appellant, and that all communications from said agents to appellant be likewise considered as communications from respondent. Respondent agreed to buy said peanuts after having examined samples drawn by Laucks & Co., public inspectors and industrial chemists in Seattle, from part of the lot sold, a few weeks prior to the date of the sale, while the peanuts lay on the dock at Seattle before being placed in the warehouse. After respondent agreed to buy the peanuts, the agents, on September 8, 1923, acting under authority from respondent, telegraphed appellant to draw on respondent against negotiable warehouse receipt for the agreed price. Pursuant to these

instructions appellant, about a week later, through a San Francisco bank, tendered a warehouse receipt calling for the delivery of the peanuts, accompanied by a draft representing the amount of the purchase price, and demanded payment. Respondent did not pay the draft at that time, however, upon the ground that before accepting delivery it was entitled to make an inspection of the peanuts in bulk in the warehouse at Seattle, to ascertain whether they conformed to the quality of the samples previously examined. After waiting until September 25, 1923, for respondent to make such inspection and to accept or reject the peanuts, during which time much correspondence passed between the interested parties, as will hereinafter appear, appellant canceled the sale. Respondent thereupon commenced this action for damages.

The decision of the trial court in respondent's favor was evidently based upon the proposition that although respondent had approved the samples previously submitted and had authorized appellant to draw upon it for the payment of the purchase price, it was entitled, under the law, within a reasonable time thereafter to make an inspection of the bulk of the peanuts in the warehouse before accepting and paying for the same. In this regard the court found that respondent had used reasonable effort to obtain such inspection prior to the cancellation of the sale.

Appellant contends that the transaction constituted a sale by sample, and that the contract was so interpreted by respondent when it authorized appellant to draw upon it on tender of a warehouse receipt; that therefore, under the law pertaining to such sales, respondent was entitled to inspect the goods for comparison either at the time of delivery or within a reasonable time thereafter, but not before; and as a condition precedent to such inspection was obliged to pay the draft upon its presentation, receive the goods, and thereafter to reject the same if they proved to be inferior to the samples submitted. The position taken by respondent is that the transaction did not amount to the ordinary sale by sample because representative samples of the subject matter of the sale were never submitted, those approved being drawn from only part of the lot sold and being taken while the peanuts were on the dock some weeks previous to the sale; that consequently respondent was en-

titled to inspect the bulk of the goods in the warehouse before paying for the same in order to ascertain if they were of the quality represented by the samples submitted and approved. (*Puritas Coffee Co.* v. *De Martini,* 56 Cal. App. 628 [206 Pac. 96]; *Newmark & Co.* v. *Smith,* 26 Cal. App. 339 [146 Pac. 1064]; Civ. Code, secs. 1766 and 1785.)

[1] Respondent concedes, however, that it was required to exercise such right of inspection and to either accept or reject the goods within a reasonable time after the same were tendered. It would therefore appear that aside from the legal question presented, if it be shown by the evidence that respondent failed to exercise such right within a reasonable time after tender, appellant was justified in canceling the sale and respondent should not recover. [2] What is a reasonable time is usually a question of fact and must be determined from all the circumstances of the individual case, but where the facts are not disputed or the matter can be ascertained from the language of the contract, it may be determined as a matter of law. (2 Mechem on Sales, secs. 1129 and 1132.) In mercantile contracts it is generally held that the parties have intended to make time the essence (*Jensen* v. *Goss,* 39 Cal. App. 427 [179 Pac. 225]; *Coats & Williamson, Inc.,* v. *Moran & Co.,* 67 Cal. App. 46 [227 Pac. 213]; *Condley* v. *Consolidated Lumber Co.,* 53 Cal. App. 8 [200 Pac. 69]; 13 Cor. Jur. 688); and the same is true where the character of the property is likely to fluctuate in value. (6 Cal. Jur. 356.)

[3] The evidence without conflict established these essential facts: That respondent approved the samples on September 7, 1923; that on the day following it agreed to purchase the peanuts and authorized appellant to draw on it against negotiable warehouse receipt. It further shows that at the latest the bulk of the peanuts was tendered on September 17, 1923, but that respondent made no effort to obtain an inspection thereof until September 21, 1923, when it telegraphed Laucks & Co., to make such inspection; that notwithstanding respondent received reports from said company after tender and prior to cancellation to the effect that the peanuts tendered compared favorably with the samples approved, it did not up to and including the morning of September 25th, indicate to appellant whether it was going to accept or reject said peanuts, but, on the contrary,

at that time wired Laucks & Co. instructions to make other and more elaborate tests which necessarily would have required additional delay. In the meantime, the evidence shows, appellant, having acquired the peanuts from the importer thereof, was repeatedly demanding that respondent either accept or reject the peanuts and warning respondent that unless it acted at once in the matter the sale would be canceled, stating in this connection that at that particular time the market was strong and the supply of peanuts limited.

The evidence upon this subject consisted entirely of correspondence and was as follows: After examining and approving the samples on September 7, 1923, respondent, through said agents, wired appellant that it "definitely confirms and accepts" said peanuts, and on the following day, September 8, 1923, authorized appellant to draw on it against negotiable warehouse receipt. The draft and the warehouse receipt were tendered at the latest on September 17th. The following day, September 18th, appellant, being advised by its bank that respondents had refused to pay the draft unless it received a "weight and quality certificate" wired the agents that it would adjust on basis of "net reweights when loaded out" and demanded immediate payment of the draft. Replying, the agents wired on September 19th that respondent was not refusing the draft, but felt that it should "have Laucks certificate or sample drawn by Laucks from seven hundred and seventy bag lot," and in a second telegram sent to appellant on the same day stated that respondent wanted a "letter guaranteeing outturn weights and weighing charges . . . also letter from Laucks or certificate guaranteeing lot as sample sent." The telegram concluded: "Please mail eight pounds for samples from eight sacks." Appellant replied immediately by telegraph direct to respondent guaranteeing to "make adjustment basis net reweights when peanuts loaded out" and to assume weighing charges; and after calling attention to the terms of their contract concluded: "We insist immediate payment of draft accordance of agreement otherwise will cancel. Will not hold up this lot any longer. Peanuts worth fifty cents more than purchase price turned down many orders last week account no supply available please advise Lilienthal definitely accepting or declining." Ap-

pellant also on the same day advised the agents by wire of the contents of its telegram to respondent and added, "we depend on you to settle this matter definitely to-day and have draft paid before close of banking hours otherwise will cancel." The next day, September 20th, Laucks & Co. telegraphed the agents that in their opinion the remainder of the lot of peanuts from which the previous samples had been taken were of the "same quality when inspected thirty days ago," which telegram was accompanied by one from appellant stating that the Laucks telegram "should be sufficient guarantee" to protect respondent, and stating further, "we absolutely demand that Bashaw pay our draft before three o'clock to-day otherwise we cancel depend on you to see this done. As regards sample drawn Laucks showing inspection pier fourteen this original import dock, but peanuts immediately moved to . . . cold storage which to Bashaw advantage insuring peanuts same condition to-day as thirty days ago." Respondent, in answer to appellant's telegram of September 19th, wrote appellant a letter, dated September 20th, claiming that the sample approved by them was not identified with the lot of peanuts tendered, and requesting appellant to "furnish samples of these 770 bags or Laucks quality certificate to cover," and the next day, September 21, 1923, respondent took the first definite step toward obtaining an inspection of the peanuts by wiring Laucks & Co. to "inspect entire lot wire if identical with samples you sent per your telegram of September twentieth to Lilienthal Williams." At the same time respondent requested a firm in Seattle named Byrnes & Co., to obtain samples and to turn the same over to one Jensen for the purpose of having Jensen wire his opinion as to quality; but as early as September 4th appellant notified the agents that Jensen, being a competitor of theirs with whom they had had some previous difficulty, would not be allowed to pass on the quality of any of its goods. On this same day, September 21st, appellant for a third time wired and also wrote to the agents, complaining of the delay, declaring that they were "disgusted with the whole matter," and that unless payment was made that day the bank would be instructed to return the draft and "forget the matter." On September 22d, Laucks & Co., in response to respondent's request made on the previous day, again assured respond-

ent as to the quality of the peanuts, stating in their tele-
gram: "Pinkham peanuts total seven hundred forty-seven
bags samples taken to-day compare favorably with samples
sent September fourth. . . . " Regarding the additional
twenty-three bags necessary to complete the order, appellant
wired the agents on that same day: "In order avoid neces-
sity returning invoice and draft advise Bashaw we guaran-
tee excess twenty-three bags same seven forty-seven. Ware-
house receipt attached to draft covers seven hundred seventy
bags and quality is uniform. Now, after all this trouble
see that our draft is paid Monday without fail. . . . "
Even then respondent did not indicate whether it would or
would not accept the peanuts, and instead of paying the
draft, telegraphed Laucks & Co. two days later, September
24th, as follows: "Wire us correct percentage of splits and
spots and if sound merchantable quality free from vermin
mold and rancidity. Mail certificate confirming wire guar-
anteeing contents." On the following morning, September
25th, appellant evidently believing, as it had stated in one
of its previous communications, that respondent was "stall-
ing," canceled the sale, saying in its letter of cancellation
to respondent that "when Laucks called on us this morning
for a permit to reinspect so that they could make five or
six different tests, draw samples, etc., we were through."
Following the cancellation of the sale, Laucks & Co. wired
respondent on September 25th the result of its inspection
and the next day wrote respondent a letter confirming its
report. The samples taken were sent to respondent by par-
cel post. Nothing further transpired until October 1, 1923,
at which time respondent sent appellant a telegram as fol-
lows: "Have now had opportunity inspect and compare
peanuts same don't equal Laucks first sample but to avoid
further trouble will dismiss action and pay draft. Please
wire bank authorization deliver merchandise receipt on pay-
ment of draft." In addition to the evidence above set forth
it was shown that C. O. Bashaw, the president of the re-
spondent company, with whom this business was transacted,
was an experienced trader, having been engaged in the
business of importing and exporting of peanuts for about
fourteen years. It therefore appears from the evidence
without dispute that respondent, after tender of the pea-
nuts, delayed four days before making any effort to obtain

an inspection of the same, and although it received two favorable reports afterward from its inspectors as to the quality of the goods, did not indicate up to the morning of September 25th, which was eight days after the tender, whether it would accept or reject the goods, but at that time made arrangements for the taking of other samples and the making of further tests which would of necessity consume additional time. In view of these facts and considering the subject matter of the sale in connection with the circumstances relating to the condition of the market, we think the conclusion inevitable that respondent did not exercise its right of acceptance of the goods within a reasonable time and that therefore appellant was justified in canceling the sale. It follows that the finding of the trial court upon this issue cannot be sustained.

[4] True, after tender of the goods on September 17th, respondent requested certain certificates or guarantees as to quality, but construing the contract most strongly against appellant, there was no duty imposed upon the latter to furnish them. After having tendered the goods in accordance with respondent's directions, which tender carried with it an implied warranty that the bulk was equal in quality to the samples (Civ. Code, sec. 1766), appellant was relieved of any further duty in the matter.

The judgment is reversed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 28, 1926, and a petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 24, 1926.