[Sac. No. 5539. In Bank. Oct. 6, 1943.]

GOLD MINING AND WATER COMPANY (a Corporation), Respondent, v. A. B. SWINERTON et al., Appellants.

22

Hartley F. Peart, Howard Hassard and Edward R. Solinsky for Appellants.

John L. McNab, S. C. Wright and Virgil Airola for Respondent.

CARTER, J.—Defendants appeal from a judgment awarding plaintiff damages in the sum of $25,000 for breach of the terms of a lease in failing to make certain improvements on the mining property covered thereby, and in the sum of $15,000 for breach of a covenant in said lease to develop and mine said property.

The record discloses that on September 21, 1937, plaintiff, as lessor, entered into a mining lease with defendants, Swinerton and Morrison, as lessees, embracing certain real property owned by plaintiff and also certain real property adjacent thereto owned by Emery Gold Mining and Water Company on which plaintiff held a lease and option to purchase. The lease between plaintiff and defendants provided that the lessor leases to the lessees and the latter hired and took from the lessor said property for a term of ten years "subject to payment of royalties and provisions" contained in the lease "on the part of the Lessees to be kept and performed," with an option for a five year renewal; lessees covenanted to pay on the 10th day of each month, a royalty of 10 per cent on gross values of all minerals extracted from the property when the recovery was 50 cents per cubic yard or less and a graduated scale thereafter; lessees covenanted to enter into immediate possession of the property, to install equipment, and commence mining within a certain time, and to work a minimum

of 300,000 cubic yards of gravel per year; the lessor warranted all unpatented claims were valid mineral locations; lessor reserved the right to use the surface of the property for agriculture purposes, subordinate however to the rights granted to the lessees; lessor, upon the lessees' consent, could use the excess water and agreed to defend the water rights; lessees would maintain the improvements and water facilities on the property, and perform the assessment work necessary to preserve the title to the unpatented claims; that lessees could cut such timber from the property as was necessary for the mining operations; all improvements (not including mining machinery) placed on the property by the lessees should be deemed fixtures; that cessation of operations for a period of not exceeding ninety days would not be a breach of the lease; that the lessors would pay the taxes assessed against the property; that lessees could terminate the lease at any time after July 15, 1938, by giving ninety days written notice on the 15th day of any month, provided the work agreed upon had been performed and the royalties had been paid which were due at the time of the termination; that lessor was entitled to terminate the lease for a default of the lessees, if the default was not cured within thirty days after notice thereof; lessor agreed not to enter into any other arrangement abridging the lessees' rights; time was made of the essence of the lease; and the lessees were prohibited from assigning the lease. The trial court found that the defendants never had performed their promises under the lease and that they had repudiated it on November 11, 1937, and refused to perform any of its provisions. Plaintiff's action was commenced in July, 1938.

Plaintiff's complaint was in two counts, the first for damages for an alleged failure of the lessee to make improvements and the second for damages for an alleged breach of the lease by defendants in failing to mine the property during the 1937-1938 water season. Defendants in a cross-complaint claimed damages for an alleged breach of the lease by plaintiff on February 1, 1938, when it lost its rights in the Emery Company property for failure to perform under its lease with that company.

It is asserted by defendants that the proper interpretation of the lease between plaintiff and defendants requires the construction that performance thereunder by defendants was not to commence until January 1, 1939, and that inasmuch

as plaintiff's action was commenced in July, 1938, it was premature, that is, that plaintiff could not have a cause of action against defendants for damages for a breach of the lease until after the time for defendants' performance had expired and they had defaulted.

The particular clause with reference to time of performance reads: "LESSEES agree, upon execution of this Lease Agreement, to enter into immediate possession of leased placer mining properties, and to diligently and constantly operate and develop same, to have all water facilities, improvements from Jesus Maria Creek, (Juri properties) fully completed and all machinery in full operation, to take advantage of water run off for season, 1937-1938, to wash and clean up for such minerals. . . . as LESSEES may be able to discover and mine within limits of said placer mining properties, and to extract, mill and reduce, and to otherwise treat said minerals, . . . LESSEES agree to work and mine aforesaid placer mining properties continuously from recording of this Lease, as date of entry thereon, and to work a minimum of 300,000 cubic yards of channel material annually, commencing with 1937-1938 water and mining season; however, not later than January 1st, 1939, contingent upon usual emergency clauses and subject to amount of water available from sources owned or controlled by LESSOR. Nothing in this Lease Agreement shall be construed to limit number of yards which LESSEES shall have right to work." The trial court found that defendants failed to immediately enter into possession of the property, failed to take advantage of the water run off season of 1937-1938, although the run off was later than the month of November, 1937, and failed to install water and mining facilities in preparation for that run off. ▆ Defendants refer to circumstances surrounding the execution of the lease as indicating that it was intended that their performance was not to commence until January 1, 1939. However, the lease on its face justifies the construction that performance by defendants was required before that time. As seen from the clause above quoted, and particularly pursuant to the first sentence thereof, defendants expressly covenanted to "enter into immediate possession of the property," that is, upon the execution of the lease which was September 21, 1937. They never did enter into possession. They expressly covenanted "to *have all water* facilities and improvements" *fully completed* and all *machinery* in *full operation,* to take advantage of water run off for season *1937-1938.* They failed to perform

any of those promises which obviously by the very terms of the lease were to be performed prior to January 1, 1939. In the second sentence of the quoted clause defendants promised to mine the property "continuously from the recording of the lease, (the lease was recorded on September 22, 1937, the day after its date) as date of entry thereon," that is, entry on the property which as we have seen was to be on September 21, 1937; and to work a minimum of 300,000 cubic yards annually commencing with the 1937-1938 water and mining season. The purported limitation in the last sentence upon those promises, reading "however, not later than January 1, 1939, contingent upon usual emergency clauses and subject to amount of water available from sources owned and controlled by lessor," is not, in any event, applicable to the promises contained in the first sentence hereinabove discussed. But even in connection with the promises contained in the second sentence, that purported limitation must mean that the first 300,000 cubic yards to be worked annually was to have been mined by January 1, 1939, rather than that that date was the time to commence mining. Another clause of the lease points to that interpretation in that it clearly contemplates that mining would be done prior to January 1, 1939, and that work on the property would have been done before that time. It reads: "LESSEES shall have right to abandon this Lease Agreement and all operations on said placer mining properties by giving LESSOR ninety (90) days previous written, registered notice on fifteenth day of any month, *beginning on July 15th, A. D. 1938,* of LESSEES' intention so to do, *and by keeping workings on said placer mining properties in full operation during said* period of time; provided, however, that all *aforesaid royalties,* — or cubic yards guaranteed annually, *due at said termination,* shall be paid or worked in full." (Emphasis added.) It is clear therefore that performance by defendants was to commence at once. The property was to be entered, and repairs and facilities placed in readiness for the 1937-1938 water run off. The property was to be continuously worked and mined from the date of the lease and entry on the property. Defendants failed to perform any of those covenants. Thus, we have a partial breach of the lease by defendants having already occurred on November 11, 1937, the date upon which defendants repudiated the lease according to the findings of the court.

That breach was material inasmuch as one of the main

objects of the lease was to have the mineral removed from the property as soon as possible and that advantage be taken of the 1937-1938 water and mining season. That time was of importance in the performance of the lease was expressly agreed by the parties in the following language: "Time and specific performance is of the essence of this Lease Agreement." It has been held that when time is made of the essence of a contract, a failure to perform within the time specified is a material breach of the contract. (*C. O. Bashaw Co.* v. *A. U. Pinkham Co.,* 77 Cal.App. 591 [246 P. 1064]; *Mappa* v. *City Council of Los Angeles,* 61 Cal. 309.)

▇ The evidence supports the trial court's finding that the lease was repudiated by the lessees in November, 1937. Defendant Swinerton testified with respect to a conversation on November 11, 1937, relating as claimed by defendants to their request for consent to assign the lease, at which he, Morrison, and an officer and director of plaintiff were present: "Q. And in any event when you left the meeting, Mr. Swinerton, you stated to them, did you not, that as far as you were concerned that you would have nothing further to do with the contract, unless they would consent to your assignment? A. I said nothing to do with the property, I think that is what I said. Q. Just to refresh your recollection— A. I may have said contract." He admitted he had testified as follows in his deposition: "Q. But you did not state on that occasion that neither you nor Mr. Morrison would proceed under the lease? A. I could not speak for Mr. Morrison but I said as far as I am concerned, I would have nothing further to do with the contract unless they would assign the contract. A. That is what I said." The other defendant lessee Morrison testified that he concurred in Swinerton's statement. With respect to that conversation, Schmidt, a representative of the corporation testified that defendant Swinerton "said he was through with it and would not go on and do anything further in it whatsoever." Immediately after that conversation Swinerton left for Europe. In a letter from plaintiff to lessees dated November 15, 1937, apparently relating to the request for permission to assign, the latter were informed that "out of courtesy to" lessees but "without prejudice to" lessor "in any manner" the lessor was making an investigation "without any assurance of consent, as you must realize your liability in performance" of the lease. On November 24, 1937, plaintiff by letter to the lessees unequivocally advised them that

plaintiff would not consent to an assignment of the lease by the lessees. We believe that those circumstances coupled with the facts that defendants never commenced any performance under the lease, and defendant Swinerton indicated that the equipment to mine the property by dredging would be more expensive than he could afford although he believed that was the best method, justified the trial court in finding a repudiation.

■ While it has been held that a repudiation must consist of a present, positive unequivocal refusal to perform the contract (*Hogue-Kellogg Co.* v. *Petit*, 48 Cal.App. 495 [192 P. 113]; *Wilton* v. *Clarke*, 27 Cal.App.2d 1 [80 P.2d 141]; *Atkinson* v. *District Bond Co.*, 5 Cal.App.2d 738 [43 P.2d 867]), and that a mere threat alone to abandon is not a repudiation, it is clear that here defendants refused to have anything further to do with the lease or property unless plaintiff consented to the assignment. It was under no obligation or duty to consent thereto. Consent to the assignment was refused shortly thereafter. Defendants had not commenced performance of the contract prior thereto nor did they thereafter. ■ Particular reliance is placed by defendants upon *Wilton* v. *Clarke, supra,* and *Atkinson* v. *District Bond Co., supra,* but repudiation is ordinarily a question of fact and intent, and must be determined by the facts in the particular case. (*Sonnicksen* v. *Sonnicksen*, 45 Cal.App.2d 46 [113 P.2d 495].) In *Wilton* v. *Clarke, supra,* the trial court found that there was no repudiation and the finding was upheld. The purported repudiation by defendant was followed by an explanation showing that his rejection of the attempted performance by plaintiff was proper. In *Atkinson* v. *District Bond Co., supra,* the statement claimed to constitute the repudiation was not coupled with a partial failure of performance by defendant or the circumstances present in the instant case, such as, that the defendants were not financially able to mine the property in the manner they thought it should be mined. No endeavor was made by defendants to withdraw their repudiation in the instant case, and plaintiff's consent to the assignment, the only contingency upon which it might be implied that defendants would perform, or rather that their assignee would perform, was refused shortly after the repudiation. In *Hall* v. *Augur*, 82 Cal.App. 594 [256 P. 232], involving an oil and gas lease, it was held that the lessee had abandoned the lease when he never commenced drilling on the property and stated he was financially unable to do so. Such an abandonment would be equivalent to a repudiation.

Strictly speaking, a total breach of a contract may arise in two ways, which, although different, have been frequently confused with each other. One is an anticipatory breach, or as it may be termed, a breach by anticipatory repudiation, which is necessarily total, and which is of importance both with relation to an excuse for nonperformance by the promisee, the repudiation being by the promisor, and the right of the promisee to recover damages immediately for a total breach of the contract before performance by the promisor is due thereunder. By its very name an essential element of a true anticipatory breach of a contract is that the repudiation by the promisor occur before his performance is due under the contract. On the other hand there may be a total breach of a contract where there has been a partial breach by the promisor, which means of course that the time for a portion of the performance was due, followed thereafter by a repudiation of the contract by him. There is, however, an exception in the case of a contract originally unilateral and not conditional on some future performance by the promisee, and of a contract originally bilateral that has become unilateral and similarly unconditional by full performance by one party. A contract is totally breached and an anticipatory repudiation occurs when the promisor without justification and before he has committed a breach, makes a positive statement to the promisee indicating that he will not or cannot substantially perform his contractual duties. (*Cobb* v. *Pacific Mutual Life Ins. Co.*, 4 Cal.2d 565 [51 P.2d 84]; Restatement, Contracts, secs. 316, 317, 318.) It follows that where there has been a partial breach by the promisor accompanied or followed by a repudiation of the contract by the promisor, the breach is total. (Restatement, Contracts, sec. 317.)

In the instant case we have as heretofore stated a situation in which there has been a partial breach by defendants followed by a repudiation of the contract which ordinarily under the rules above stated would constitute a total breach for which plaintiff could recover all past and prospective damages suffered, in an action which it could bring immediately after the repudiation. Even if it be assumed in the instant case that the lease was a bilateral contract which had become unilateral by the full performance thereof by the plaintiff-lessor-promisee when it demised the premises to the lessees, and that therefore, under the general rule a partial breach coupled with a repudiation would not constitute a

total breach entitling plaintiff to bring an action for prospective damages, the result is the same because that rule does not apply where the acts to be performed by the promisor are connected with one another such as under the circumstances of this case. Where the acts to be performed by the promisor are connected, and the thing to be accomplished by the contract is an entirety, the breach may be total where there is a partial breach coupled with repudiation even though the promisee has fully performed the bilateral contract. (Restatement, Contracts, sec. 316.) In the case at bar the obligations of defendants, lessees, were indivisible and not separable. They were to continuously mine the property as rapidly as due diligence required and extract the minerals therefrom. Clearly, the lease contemplated the continuous extraction of minerals by lessees as one entire obligation. The mere fact that the royalties were payable monthly and that 300,000 cubic yards were to be worked annually carries no implication that each payment of royalties was severable from the other, or that each year's output of 300,000 cubic yards was severable from every other year. Rather the one was merely a specification of the time for paying whatever the royalties there might be and the other a minimum below which the output should not fall. It is not like the case of money payable in fixed installments.

 From the foregoing discussion it further follows that even if defendants' interpretation of the clause with reference to their time to perform under the lease is accepted we still would have a true anticipatory breach on defendants' part by reason of their repudiation of the lease which would entitle plaintiff to recover prospective damages. In this connection defendants urge that the doctrine of anticipatory breach cannot be applied to a lease as distinguished from an ordinary contract; that rental under a lease is paid in installments and the lessor must wait for each installment to fall due before he has a cause of action for a breach of the lease. They rely upon *Bradbury* v. *Higginson,* 162 Cal. 602 [123 P. 797]. That case involved an ordinary lease in which the property was leased on December 13, 1904, for five years with a rental of $100 per month. The lessee took possession and paid the rental to and including June, 1909, but thereafter defaulted. Plaintiff lessor commenced his action in August, 1909, claiming the full *rent* for July and August and also for the four months remaining in the term of the lease. The court held that a recovery could not be had for the

full rent but stated that an action for *damages* was proper where there was a default and repudiation by the lessee. It said at page 604, referring to the right of the lessor where the lessee has failed to pay the rent and has abandoned the lease:

"That a landlord may have an action for *damages* for breach of contract when a tenant abandons his lease is not questioned by any of the authorities. His *damages*, however, in that event, are to be ascertained in a particular way. *Where a lease is repudiated and the premises abandoned,* the landlord *may pursue one of two courses:* He may rest upon his contract and sue his tenant as each installment of rent, or the whole thereof, becomes due; *or,* he may take possession of the premises and *recover damages,* which damages will be the difference between what he *may* be able to rent the premises for and the price agreed to be paid under the lease. Where he sues for damages, he cannot in advance recover the *full* price to be paid for the unexpired term, but the amount of his recovery is *limited* as just indicated." (Emphasis added.) Later in the opinion it is recognized that an action for damages, as distinguished from one for rent, will lie for the anticipatory breach of a lease. It was said at page 608:

"But it is argued that the plaintiff had the right to recover on the doctrine of 'anticipatory breach' (*Alderson* v. *Houston,* 154 Cal. 1 [96 P. 884]); that is to say, that the defendant's repudiation of the obligations of his lease gave the plaintiff the right to treat the entire contract as broken, and to recover at once the damage sustained by such breach. But in an action to recover for such breach, the measure of *damage* would be, not the *total rent* reserved, but the difference between the rent to accrue and the value of the remaining portion of the term. The complaint does not aver that plaintiff has sustained any damage by the defendant's repudiation, nor does it state any facts from which the amount of such damage may be inferred." It would seem from the foregoing language that the lessor might bring an action for all damages immediately upon the lessee's default and repudiation of the lease. Those damages would consist of the difference between the reasonable rental value of the property and the agreed rental for the remainder of the term of the lease. (See 20 Cal.L.Rev. 627.) Although it would seem that under the rule in the Higginson case the lessor need not wait until the end of the term to sue for damages, doubt has been cast on that view. (See *Phillips-Hollman, Inc.* v. *Peerless Stages,* 210 Cal. 253

[291 P. 178]; *Syrett* v. *Strickland,* 86 Cal.App. 623 [261 P. 484]; *Strei* v. *Brooks,* 95 Cal.App. 589 [273 P. 145]; *Treff* v. *Gulko,* 214 Cal. 591 [7 P.2d 697]; *Pacific States Corp.* v. *Rosenshine,* 113 Cal.App. 266 [298 P. 155].) The weight of authority appears to permit an immediate action to recover damages for the entire term where the lessee defaults in the payment of rent and repudiates the lease. (See cases collected 137 A.L.R. 432.) ▆▆ Whatever may be the correct rule in the case of an ordinary lease, mining leases are in a class by themselves. As we have seen, the lease in the instant case is indivisible. It was not contemplated that certain sums of money were to be paid periodically for the use of the leased premises. The main object was the removal of the minerals from the ground, and the periodic payment of royalties was merely a convenient method for their prompt and orderly payment. As stated in *Hall* v. *Augur, supra,* with reference to an oil and gas lease, at page 600:

"The duty to drill and develop the property upon the discovery of oil or gas in paying quantities is not to be regarded as a mere covenant, but in a case like this, where *practically the whole consideration must depend upon the undertaking,* it is to be treated as a condition precedent." (Emphasis added.) And again at page 601:

"The main consideration for the execution of these leases was the payment of royalties to the plaintiffs, which *could only be obtained through drilling the oil wells.* Royalties were never paid because no wells were drilled." (Emphasis added.) In the ordinary lease of real property the lessor is not concerned with a development or operation of the property by the lessee, but only in payment of the rent installments as they become due. If the lessee abandons the lease the lessor has the use of the property. However, in a mining lease, upon abandonment, the lessor, it is true, has the use of the property and still has the mineral in the ground, but he *does not have that mineral removed,* the obligation which the lessee assumed. It is only a general rule that mining leases are to be governed by the same rules as ordinary leases, which must give way in certain circumstances when we consider the above discussed persuasive reasons therefor.

▆▆ Defendants urge that plaintiff lost its rights to the Emery property and therefore breached its covenant of quiet enjoyment by depriving defendants of the opportunity to mine the property. It will be recalled that a portion of the property embraced in the lease here in question was held by

plaintiff by virtue of a lease to it from the Emery Company. In February, 1938, plaintiff's rights under the latter lease were declared forfeited by the Emery Company for plaintiff's failure to perform thereunder. In this connection defendants also urge that damages should have been awarded to them under their cross-complaint which was based on the same alleged breach of the covenant of quiet enjoyment. Both contentions are untenable for the same reason. Prior to February, 1938, there was no breach of the covenant. The loss by plaintiff of its rights in the Emery Company property did not occur until *after* the defendants had repudiated the lease. After the total breach by the defendants, plaintiff was excused from performance under the lease. It was said by this court in *Naify* v. *Pacific Indemnity Co.*, 11 Cal.2d 5, 10 [76 P.2d 663, 115 A.L.R. 476]:

"Finally, the normal effect of repudiation of a contract and refusal to perform on one side is the excuse of performance on the other side; . . ." Furthermore, it is expressly provided in the lease that its continuance in force was dependent on the performance of its provisions by defendants. The clause reads: "LESSOR hereby leases and demises aforesaid placer mining properties to LESSEES for placer mining purposes for a term of ten (10) years from date hereof, *subject to payment of royalties and provisions herein contained on part of* LESSEES to be kept and performed. . . ." (Emphasis added.) The cases relied upon by defendants did not involve the situation where because of a total breach the lessor's performance was excused.

Defendants argue that because of dealings with a certain Mr. Johnson, a new lease of the property was made between Johnson and plaintiff, and that the instant lease was thereby terminated and defendants released from liability thereunder. In this connection defendants also assert that the conduct of plaintiff from October, 1937, through January, 1938, induced them to believe that plaintiff would lease the property to Johnson and thereby release defendants. The evidence on the subject is conflicting. Suffice it to say that Mr. Schmidt, one of the officers of plaintiff testified that neither he nor his fellow officers ever assented to a new lease with Johnson, nor ever gave an assent to the assignment by the defendants of the instant lease to Johnson, and never consented to any change in the instant lease.

The trial court found that plaintiff was damaged in

the sum of $25,000 by reason of the failure of defendants to improve and repair the water system to make it usable for mining and to make water available for mining operations. Defendants urge that their obligation to repair and improve the water facilities was inseparably connected with and an incidental part of their main covenant to mine and operate the property and remove the mineral therefrom; and that therefore damages should not have been given for loss of royalties for failure to mine and also damages for failure to repair the water facilities; that one of the items of damages necessarily embraces the other. There are several clauses in the lease which must be considered in this connection. There is a provision that the use of the surface of the property is reserved by plaintiff for agricultural purposes and that: "LESSOR shall have right, *upon prior written consent* of LESSEES, to use all excess water to be mutually agreed upon, not used by LESSEES in operations; provided, however, that such uses shall not interfere in any manner with LESSEES' operations hereunder and that said use shall be wholly at risk of LESSOR. . . . Pursuant to LESSEES' *consent,* LESSOR shall have right to use such excess water through and by means of all equipment of water diversion works now on placer mining properties, or any additions, improvements, or repairs made by LESSEES: provided, however, that if it is necessary to increase aforesaid diversion water works, a mutual Agreement shall be made in writing as to payment by LESSOR of increased ratio cost for such use of excess water. . . . Expressly mutually understood and agreed, however, that aforesaid water rights, privileges and use of water, shall only be upon LESSOR'S placer mining properties." (Emphasis added.) That term of the lease might imply that the covenant with respect to the repair of the water facilities was separate because the water was to be used by the lessor for agricultural purposes, but it is to be noted that the lessor is entitled to use the excess water *only with the consent* of the lessees. The defendants-lessees were not obligated to give their consent. That clause does not therefore necessarily establish that the covenants were separable. In the clause relating to the obligation of the lessees to mine the property it is said: "Lessees agree . . . to operate and develop same (property), to have all water facilities, improvements from Jesus Maria Creek . . . fully completed and all machinery in full operation, to take advantage of water runoff, . . ." It might well be argued from that clause

alone that the repair of the water facilities was solely incidental to the mining operations and did not constitute an individual obligation for the breach of which damages might be recovered. But the lease further provides: "Lessees agree to keep, protect and maintain all buildings, flumes, ditches, reservoirs, pipelines and other workings now or hereafter situated upon said placer mining properties, and to deliver up same together with appurtenances and all improvements thereon in good order and condition, ordinary wear and tear, and acts of God and elements, excepted." And also that: "All buildings, improvements and water diversion works that *may be* placed in or upon aforesaid placer mining properties by LESSEES, during term of this Lease Agreement, shall be deemed affixed to said placer mining properties and become a part thereof, and upon termination of this Lease Agreement, same will not be removed from said placer mining properties. . . ." (Emphasis added.) Those terms definitely contemplate that the water facilities were to be improved and repaired, and the lessor had a definite interest therein, inasmuch as such improvements were to become its property. It is also clear that the improvement of the water system was to be of such a character as to render it adequate and adaptable for mining the property rather than for other uses to which it might be put.

In connection with the award of $25,000 for the failure to improve the water system, defendants further urge that the only evidence of damages was hearsay, that the evidence was insufficient to maintain the award, and that the court applied as the measure of damages the cost of the improvements rather than the lessened value of the lessor's reversion because of the failure to make the improvements.

The court found that defendants were not obligated to construct certain dams as a part of the restoration of the water system and that there is nothing in the lease "setting forth the amount of improvements to be made upon the properties described in said Lease Agreement by the defendants, or the method by which the properties should be worked, or that a storage dam to cost $50,000.00 should be built on Jesus Maria Creek by the defendants, or either of them; that it was not contemplated by the parties to said Lease Agreement that the sum of $167,735.00 should be spent by the defendants upon the water system; but the Court finds that a *reasonable sum of money was to be expended* by the defendants upon the water system to bring water to the mining properties and

to repair the water system to make it usable for mining; and the Court finds that an expenditure of no greater sum than $25,000.00 was in the minds of the parties to be spent by the defendants to bring the water to said mining properties, and the Court finds that the sum of $25,000.00 was a *reasonable sum* to be expended to put said water facilities in order and to enable said properties to be operated as required by the provisions of the Lease Agreement, and in this connection the Court finds that although $25,000.00 was a reasonable and necessary sum the defendants did not expend any sum whatever and did nothing to fulfill the requirements assumed by the defendants in said Lease Agreement." (Emphasis added.) Defendants assert that the $25,000 referred to as having been contemplated by the parties was based solely upon hearsay evidence consisting of a letter written by plaintiff to the Emery Company prior to the execution of the lease here involved, suggesting leniency in the performance by plaintiff of its lease with that company. It was there stated that plaintiff had a group interested in mining the property, referring to a lease with defendant Morrison alone, and that certain repairs were to be made by the group which was "budgeted by them at $25,000." That letter was introduced by defendants in their cross-examination of one of plaintiff's officers. Whatever may be the validity of that evidence the findings may not be so narrowly interpreted as to be based solely thereon. It is to be noted from the foregoing quoted excerpt from the findings that the court also found that "the sum of $25,000 was a reasonable sum to be expended to put said water facilities in order and to enable said property to be operated as required by provisions of the lease." And later in the findings the court stated "the Court finds that a reasonable sum to be spent for said purpose on said mining properties was $25,000.00 *and* the Court finds that an expenditure of no greater sum than $25,000.00 was in the minds of the parties, and the Court therefore finds that said sum of $25,000.00 was a reasonable sum to be expended *and* was the sum in the contemplation of the parties . . . " (Emphasis added.) At most the letter was in the mind of the trial court as the maximum the parties expected to expend and is therefore not particularly significant. The same appears to be true of the court's language in its memorandum of opinion.

There is ample evidence other than the letter from which the trial court could have concluded that the sum of

$25,000 was a reasonable amount to cover the cost of the improvements contemplated. Plaintiff's witness Scott testified in great detail of the cost of restoring the water system, arriving at a total figure of over $167,000. Evidently the trial court rejected some of his items and accepted others. It is true that Scott based his estimates upon mining the property by the hydraulic method, rather than by mechanical means, such as a power shovel or dredger, and as pointed out by defendants there is nothing in the lease requiring that such method of mining be used. But there is nothing in the lease as to what method should be employed. Defendants' evidence shows various figures approximating $3,000 as the cost of restoration of the water system based on mechanical mining. Under these circumstances we cannot say that there was no substantial evidence supporting the finding. We have seen that the character of the improvements was to be such as would make the water available for mining as distinguished from other uses. Where the method of mining the property is not specified in a mining lease, it may be fairly said that the lessee is obligated to mine the property in a reasonable manner compatible with the most expeditious removal of the mineral therein, taking into consideration the costs involved, the contemplation of the parties, and the nature and character of the property to be mined.

Various statements have been made with reference to the proper measure of damages for a breach by a lessee of a covenant to improve or repair the property. It is said in 36 C.J. 175:

"The general rule is that upon a lessee's breach of covenant to make improvements, a lessor can recover only what it would cost to make them, and the difference in the rental value of the land until they could be made after the expiration of the term. But it is also held that the measure of damages where the lessee removes the improvements he has covenanted to make and leave for the benefit of the lessor is the difference between the value of the premises with and without the improvements. Damages for breach of covenant to make an improvement within a specified time within the term have been measured by the injury to the reversion at the end of the term reduced to its present value, or by such sum as, with interest, will produce the fair cost of improvement at the end of the term." It is said in 32 Am.Jur., Landlord and Tenant, section 801: "Where, during the continuance of the tenancy, the landlord brings an action for

the breach of a covenant to repair by the tenant, the measure of damages is generally held to be the amount by which the reversion is injured on account of the property being out of repair. It would not be fair or just, particularly where the lease has a long time to run, to take the amount necessary to put the premises into repair as the measure of the damages; for in such cases, when the damages are awarded to the landlord, he is not bound to expend them in repairs, nor can he do so without the tenant's permission to enter on the premises. In some cases, however, it has been held that a landlord is entitled to recover the cost of putting the premises in proper repair, although the action is brought by him before the termination of the lease.

"In an action for the breach of a tenant's covenant to keep the premises in repair, brought after the expiration of the term, the plaintiff's measure of damages is the cost of putting the demised premises into the state of repair contemplated by the broken covenant, and if the landlord is himself compelled to do the repairs after the determination of the term, he is entitled also to compensation for the loss of the use of the premises which has presumably been suffered during the time while the repairs were being executed."

■ In the case of a mining lease such as is here involved, where there has been a failure to perform and a repudiation by the lessees, the rule to be applied should be the same as where the term has expired; that is, the lessor is entitled to recover the reasonable cost of the improvements or repairs which the lessees agreed to make under the terms of the lease. The evidence supports the findings that the reasonable cost of the improvements and repairs contemplated was the sum of $25,000.

■ In the second count of its complaint plaintiff alleged that there were in excess of 300,000 cubic yards of mineral bearing gravel on the property of an average gross value of 90¢ per yard. The trial court found that: "the gross average value of said gravel is 50¢ per cubic yard and that there was a minimum of 300,000 cubic yards of the average gross value of 50¢ per cubic yard in said properties capable of being mined and removed by the defendants annually." In what it termed its order for judgment but what might be more aptly described as its memorandum opinion, the trial court stated: "However, from all the testimony as to value, I find the value to be 50¢ per cubic yard. Plaintiff's royalty would amount to $15,000 thereon." Although the memorandum opinion is not properly a part of the record on appeal, it may

be used to assist in determining the action of the court. At 50¢ per cubic yard, the gross value of the mineral in 300,000 cubic yards of gravel would be $150,000. Ten per cent of that figure is $15,000, the amount awarded by the court.

Appellants contend that the trial court applied the wrong rule as to the measure of damages to which plaintiff may be entitled for the failure of the defendants to mine 300,000 cubic yards of gravel during the mining season of 1937-1938. On page 65 of Appellants' Opening Brief counsel state: "As a matter of law, the measure of damages is not as the trial court assumed. In an action for unpaid royalties the lessor is only entitled to recover the agreed upon percentage (in the instant case, 10%) of that sum which is left after deducting from the value of the quantity of ore which lessees were required to mine the value of the ore left in the mine." In support of this proposition they cite the following cases: *Lyon* v. *Miller*, 24 Pa. 392; *Whiteside* v. *Rocky Mt. Fuel Co.*, 101 F.2d 765; *Keating Co.* v. *Inland Steel Co.*, 157 Minn. 243 [195 N.W. 1016] ; *Milligan* v. *Haggerty*, 296 Mich. 62 [295 N.W. 560]. We have examined these cases, and while the rule announced therein is not very clearly stated, we gather therefrom that it was the intention of the courts to hold that where a lessee has agreed to mine coal on a royalty basis and ceases mining operations before he has mined all of the coal covered by the lease, the lessor is not entitled to recover the full amount of royalty specified in the lease for the unmined coal. But just what rule should be applied for the determination of the amount of damages in such cases is not made clear by the opinions in the above-cited cases.

The problem presented is not simple, and its solution involves a consideration of various rules relating to the measure of damages for breach of a contract providing for the extraction of mineral from land on a royalty basis.

The majority rule relating to oil and gas leases appears to be that where a lessee fails to perform his lease and the lessor suffers damages as a result of the loss of royalty on the oil or gas which the lessee would have extracted from the leased premises had the lease been performed, the lessor may recover the full amount of the royalty to which he would have been entitled had the lessee fully performed. (*Fallis* v. *Julian Petroleum Co.*, 108 Cal.App. 559 [292 P. 168] ; *Julian Petroleum Corp.* v. *Courtney Petroleum Co.*, 22 F.2d 360.) This rule is referred to as the "royalty rule."

In 2 Summers Oil and Gas, at pages 433-435, the author states:

"While there seem to have been no objections to the application of the so-called royalty rule for the measure of damages where there has been a breach of express or implied covenants of the lessee to drill protection wells, yet it was suggested in a West Virginia case that when this rule is applied to a situation where there has been a failure to drill sufficient additional wells to reasonably develop the property, it results in paying the lessor double damages for the breach of the covenant. It is there pointed out that if the lessor is paid the value of the royalty upon the oil or gas which should have been produced but was not, the oil still remains in the land and when produced by the lessee at a later time the lessor will again receive this royalty. The court suggests that the interest on the value of the royalty more nearly approximates the true measure of damages. This objection to the royalty rule is apparently very similar to that which was urged in the Pennsylvania case of *Lyon* v. *Miller*, causing the court to hold that the measure of damages for a breach of a covenant to mine coal was the value of the royalty on the coal that should have been mined, less the value of such mineral in the land. This rule has, however, been disapproved by later cases in the same jurisdiction, as well as by decisions of other courts. There is undoubtedly some merit to the above-mentioned criticism of the royalty rule, particularly where the breach complained of is a cessation of reasonable development for a period of time, and the lessee does continue thereafter to reasonably develop and operate the land. In such a situation the lessee does eventually mine the mineral which should have been mined previously and does again pay the royalty on this mineral which has already been received by the lessor by way of damages. *If the lessee fails or refuses to resume operations under the lease, he cannot complain of the royalty rule as the proper measure of damages, for he never pays the royalty the second time.* On the other hand, if the lessee resumes reasonable operations, or operations expressly required by the lease, he may be able to invoke the aid of a court of equity to relieve him of paying the royalties upon the unmined minerals, which he has paid once in the form of damages."

It is said in *Stoddard* v. *Illinois Improvement & Ballast Co.*, 275 Ill. 199 [113 N.E. 913, 915] (involving a rock quarry):

"Having retained possession of the premises and having

failed to surrender the lease or to develop the property, it is liable for the amount of stone it could, by reasonable diligence, have quarried and sold at a profit for the remaining three years of the lease, at 6 cents per cubic yard, the price fixed in the lease.''

It has also been held that in an action for damages for failure to develop sulphur lands under a contract, the owner's measure of damages is the amount of royalties he would have received had the mine been operated during the period when operations were unreasonably suspended, with interest from the date the royalties would have accrued. (*Freeport Sulphur Co.* v. *American Sulphur Royalty Co. of Texas,* 117 Tex. 439 [6 S.W.2d 1039, 60 A.L.R. 890] ; see, also, *Macon* v. *Trowbridge,* 38 Colo. 330 [87 P. 1147] ; *Gilmore* v. *Ontario Iron Co.,* 86 N.Y. 455.)

It seems clear to us that the correct rule for the measure of damages in a case such as this should be one which would place plaintiff in the same position it would have been in had defendants performed the covenants contained in the lease.

It appears from the record in the case at bar, and the court found, that if the defendants had operated the mining property covered by the lease in question in accordance with the provisions thereof, they would have extracted the sum of $150,000 from the 300,000 cubic yards of gravel which they agreed to mine during the mining season of 1937-1938. Of this amount plaintiff would have received the sum of $15,000 as royalty. Defendants failed to perform their covenant to mine the property and plaintiff received no royalty. Plaintiff therefore suffered a loss as the result of the failure of the defendants to perform the covenant in question. Defendants breached their lease, abandoned the property and will never operate the property under the lease involved in this action. Plaintiff may not desire to operate the property itself, and may not be able to obtain another lessee to do so. True, plaintiff still has the mining property and may lease it again on a royalty basis, but even if it does so and receives a royalty on all of the gold extracted from the 300,000 cubic yards of gravel which defendants agreed to extract, plaintiff will not thereby recover double damages or receive *as royalty* the amount it is entitled to recover from defendants as damages. In other words, what plaintiff is entitled to recover from defendants under the rule here announced *is damages for the failure of defendants to perform their agreement under the lease to mine the property, extract*

*the mineral therefrom and pay plaintiff a royalty thereon.*
Since defendants have failed to perform, plaintiff may recover from them as damages an amount equal the amount of royalty which plaintiff would have received had defendants operated the property in accordance with the provisions of the lease.

Upon proof by plaintiff of the execution of the lease, and of defendants' failure to perform, and of the amount of royalty which plaintiff would have received had defendants performed, plaintiff made out a prima facie case for the recovery of damages against defendants. To meet this prima facie case defendants may have been able to show that plaintiff had not in fact suffered the amount of damages claimed because the property had been either leased to other operators on the same or more favorable terms than those specified in defendants' lease or that plaintiff had operated the property itself and recovered an amount equal to or greater than the royalty specified in defendants' lease; or other facts might have been established which would have the effect of diminishing the amount of damages suffered by plaintiff as the result of being deprived of the royalty which the defendants agreed to pay. That defendant has such burden of proof is held in *Milligan* v. *Haggerty, supra,* the court citing as authority therefor *Tradesman Co.* v. *Superior Mfg. Co.,* 147 Mich. 702 [111 N.W. 343, 112 N.W. 708], and *Flickema* v. *Henry Kraker Co.,* 252 Mich. 406 [233 N.W. 362, 72 A.L.R. 1046]. In the Tradesman case the claim was for damages by the operator of a newspaper for breach of a contract by one hiring advertising space. It was held that the defendant had the burden of proving that plaintiff could have obtained other advertisers for the same price; that plaintiff made out a prima facie case of damages by proving the contract price. The Flickema case involved an employment contract in which it was held that an employee whose contract of employment had been broken made out a prima facie case by proving the contract price, and the burden was on defendant employer to establish that the employee could have obtained employment elsewhere. The same rule has been adopted in California. (*Seymour* v. *Oelrichs,* 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154].) No such proof was offered by defendants in the case at bar, as the record discloses that the property covered by the lease was not operated after defendants breached their lease and plaintiff has never received any portion of the royalty which the defendants agreed to pay from the proceeds

of the gold which the defendants agreed to extract from the property pursuant to the provisions of the lease. The subject is ably and comprehensively discussed in the case of *Texas Pacific Coal & Oil Co.* v. *Barker,* 117 Tex. 418 [6 S.W.2d 1031, 1037, 60 A.L.R. 936], which involved an oil and gas lease.

The trial court found against the defendants on all of the defenses interposed by them, and, as we have heretofore stated, the findings of the trial court find ample support in the evidence.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Traynor, J., and Schauer, J., concurred.

EDMONDS, J., Dissenting.—Certainly there is substantial evidence to support the finding of the trial court that the appellants repudiated the lease and did not take possession of the property. But assuming that the provision of their agreement requiring repair of the water system is an independent covenant unrelated to the requirement "to work a minimum of 300,000 yards of channel annually" and entitling the lessors to recover separately for its breach, I cannot agree with the conclusion of my associates as to the measure of damages for the breach of the obligation to do the required amount of mining. In my opinion the theory upon which the judgment in this particular is affirmed is contrary to elementary rules of the law relating to contracts.

The appellants agreed to operate certain placer mining properties and the trial court found "that there was a minimum of 300,000 cubic yards [of gravel] of the average gross value of 50¢ per cubic yard in said properties capable of being mined and removed by [them] . . . annually." At the rate fixed by the lease, had the covenant been performed, the lessor would have received $15,000, which is the amount the trial court awarded in the judgment now affirmed.

The vice of allowing a recovery equaling the consideration of the contract is that it gives the lessor the amount of his royalty and, in addition, leaves him with his mineral deposit. To me, such an award clearly violates the legislative prohibition that "no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides, except in the cases specified in the articles on exemplary damages and penal

damages. . . ." (Civ. Code, sec. 3358.) This rule is a fundamental principle of contract law. As restated in Corpus Juris Secundum, the "plaintiff is not to be put in a better position by a recovery of damages for the breach of a contract than he would have been if there had been performance." (25 C.J.S., Damages, sec. 74, pp. 565, 566.) By the decision in this case, the lessor recovers $15,000, the amount which it would have received had the contract been performed and also retains the 300,000 cubic yards of gold-bearing gravel; it gets full payment for the mineral deposit which it still has.

The fugacious qualities of petroleum substances justify courts in allowing the recovery of the full royalty upon them upon the breach of an obligation to produce oil and gas. However, to apply that measure of damages in a case such as the present one gives the landowner much more than he would have received had his contract been fully performed. The Supreme Court of Michigan recently refused to allow such a recovery and approved the rule stated by the trial judge as follows: "The measure of damages for breach of an implied contract to mine all the coal that may be reasonably mined is the stipulated rate for the quantity which could have reasonably been mined, but was not, deducting its value unmined." Citing as authority *Lyon* v. *Miller,* 24 Pa. 392, and the note in 60 A.L.R. 935, it held that the plaintiff could not recover the full amount of rental agreed to be paid under a lease for the purpose of excavating clay. Again adopting the language of the trial judge, it said: "The reason why this rule is fair and equitable is that if the Court should award to plaintiff the value of the brick per thousand which could be manufactured from the remaining portion of the area, then not only would plaintiff have a judgment for the full amount, but during a normal period he would also be able to realize on re-sale, practically the same amount, and therefore, the harvest would be double, which in the opinion of the court, would work an injustice on the defendant." (*Milligan* v. *Haggerty,* 296 Mich. 62 [295 N.W. 560, 564].)

The same measure of damages was recently applied by the federal court which held that the value of the deposit of coal not mined must be considered in reduction of the amount agreed to be paid under the contract. "When the lessee ceases to mine, the additional coal which he would have taken out if he had continued reverts to the lessor's benefit to be taken out by him or some other sub-lessee. So the lessor's damage in such case can not be said to be the full amount

of the minimum royalties during the remainder of the lessee's term." (*Whiteside* v. *Rocky Mountain Fuel Co.*, 101 F.2d 765, 768.)

The statement in Sumner's Oil and Gas, quoted and relied upon in the majority opinion, that the leading case of *Lyon* v. *Miller*, 24 Pa. 392, has been disapproved by later cases in the same jurisdiction as well as by decisions of other courts, is not supported by authority. The only decision cited by the author to sustain his assertion is *Berwind-White Coal Mining Co.* v. *Martin*, 124 F. 313 [60 C.C.A. 27]. But the court in that case observed, "The defendant relies on *Lyon* v. *Miller*, 24 Pa. 392, and *Kille* v. *Reading Iron Works*, 141 Pa. 440 [21 A. 666]; but in neither of these was there any provision for the payment of a definite annual quantity whether mined or not, a most material distinction." Because of such a provision in the contract before it, the stipulated annual installments were considered to be amounts of liquidated damages. In the present case the agreement is to pay a royalty of 10 per cent on the gross values of all minerals extracted from the property on a recovery basis of 50 cents per cubic yard.

The covenant in the contract of Swinerton and Morrison may be construed in either of two ways. If it is an agreement by the mine owner to sell a minimum of 300,000 cubic yards of gravel, the sale price being the stipulated royalty of 10 per cent of the gross recovery value of the gold content, then, under the theory of *Lyon* v. *Miller, supra,* the full amount of the royalty may be recovered only if the gravel has no value unmined, or if the lessor, as the seller, had affirmed the sale so as to transfer title to the appellants as the buyers. (See Civ. Code, sec. 1783.) But the record shows a finding based upon substantial evidence that the value of the gravel was 50 cents per cubic yard, and the respondent's action for damages is inconsistent with a claim based upon a transfer of title.

If, on the other hand, the covenant is considered as one for the performance of services, that is, an agreement to mine a minimum of 300,000 cubic yards of gravel for a consideration of 90 per cent of the gross recovery value, the consideration for the appellants' promise, which the lessor agreed to pay, must be deducted from the value of the services. This rule is illustrated by the American Law Institute in its discussion of section 335 of the Restatement of Contracts as follows: "A contracts to convey land to B in return for

B's service for one year. B refuses to do the work. A can get judgment for the value of the service promised less the value of the land retained by him." In the present action, the respondent has retained the gravel from which the consideration for the appellants' covenant to mine was to be obtained, and is allowed to recover the full value of the services agreed to be rendered.

And the rule of damages applied by a majority of the court is that upon proof of the breach of the contract, the mine owner at least established a prima facie case entitling him to a judgment for the full amount of the royalty. This is, in effect, saying that if the owner of an automobile agreed to sell it for a stated amount, upon breach of the contract by the buyer he may sue for the consideration and in the absence of any evidence of value by the defendant, be entitled to retain his automobile and have judgment for the sale price. Such a doctrine is contrary to the elementary principle that in an action for damages, where the title to the subject matter remains in the vendor, the measure of recovery is the *difference* between the contract price and the value of what is retained, and it is a part of the plaintiff's case to establish both factors from which the difference may be computed. (*Boyles* v. *Kingsbaker Bros. Co.*, 5 Cal.2d 68 [53 P.2d 141]; *Coburn* v. *California Portland Cement Co.*, 144 Cal. 81 [77 P. 771]; *San Francisco Milling Co., Ltd.* v. *Frye & Co.*, 2 Cal.App.2d 563 [38 P.2d 165]; *Bonan* v. *Pacific Orient Co.*, 140 Cal.App. 68 [34 P.2d 1064]; *Aimo* v. *Mitchell*, 124 Cal.App. 497 [12 P.2d 1059]; *Hougland* v. *Roth Blum Packing Co.*, 99 Cal.App. 631 [279 P. 159]; *Nye & Nissen* v. *Weed Lumber Co.*, 92 Cal.App. 598 [268 P. 659]; *Gopcevic* v. *California Packing Corp.*, 64 Cal.App. 132 [220 P. 1078]; *Meyer* v. *McAllister*, 24 Cal.App. 16 [140 P. 42]; *Cuthill* v. *Peabody*, 19 Cal.App. 304 [125 P. 926]; and see 22 Cal.Jur., p. 1062, sec. 121.)

But even were the rule announced by the majority opinion correct, its conclusion still may not be justified by the facts of the case, for the uncontradicted evidence in the record shows that the gravel could be mined at a cost of 30 cents per cubic yard, thus yielding a profit of 20 cents per cubic yard.

Appellants' petition for a rehearing was denied November 4, 1943. Edmonds, J., voted for a rehearing.