[Civ. No. 27017.   Second Dist., Div. One.   July 15, 1963.]

KARM SINGH et al., Plaintiffs and Respondents, v. IDA
BURKHART, an Incompetent Person, etc., Defendant
and Appellant.

Maurice Rose and Marvin E. Levin for Defendant and Appellant.

Jack Schnider and F. Walter French for Plaintiffs and Respondents.

FOURT, J.—This is an appeal from a judgment wherein among other things the defendant Ida Burkhart (by and through her guardian Schiff) was ordered to perform specifically an agreement to sell certain real property upon being paid the consideration agreed upon.

A résumé of some of the facts is as follows: Ida Burkhart was the owner of certain described real property located in Santa Monica and she desired to sell the same. Upon her own accord she went into the office of Thornbury Realty Company in Ocean Park and talked with Harry Baizer, a salesman for the Thornbury Realty Company. Mrs. Burkhart stated to Baizer that she had some property in Santa Monica which she wanted to sell and she gave Baizer a description of the same. Baizer indicated to Mrs. Burkhart that he would look at the property and ascertain what he thought it should bring upon a sale. The office of the Thornbury Realty Company and the property in question are several miles apart and Baizer went to the location of the property and examined it. He also contacted P. J. Burns and a Mr. Carlson with reference to what the property should sell for and they referred him to Sidney Grey. Grey was in the real estate business and operated as Grey Associates and was a member of the Realtors' Multiple Listing Service, Santa Monica Bay District Board of Realtors. Grey, after looking

at the property, informed Baizer that he thought the market value of the property was $50,000.

Baizer thereafter advised Mrs. Burkhart on or about Tuesday, January 17, 1961, that they, Thornbury Realty, could get $50,000 for the property. She suggested that the commission should be added to the sales price and then asked $52,500 for the property. An exclusive listing agreement was prepared upon the ''California Real Estate Association'' listing form and it was signed by Mrs. Burkhart as the owner of the property and by Baizer for Thornbury Realty. The sales price of the property was to be $52,500 with a down payment of $15,000 and the balance payable at $350 or more per month including 6 per cent interest upon the balance until paid. A brokerage commission of 5 per cent of the selling price was to be paid by Mrs. Burkhart ''if said property is sold during the term hereof or any extension thereof by broker or by me or by another broker or through any source.'' The property was then put on the ''Realtors' Multiple Listing Service, Santa Monica Bay District Board of Realtors, Inc.'' of which Thornbury Realty was a member. The description of the property appeared on a circular of the multiple listing service dated Friday, January 20, 1961, under the title, ''Advance Listings.'' The price and down payment as heretofore set forth were listed in such circular. Max Kramer, a salesman in Grey's realty office in Santa Monica, apparently received a copy of the listing when it came out about the 20th of January 1961. Grey and Kramer went out to check some of the properties which were listed in the bulletin including the property in question. Kramer had not talked with Grey about the particular property before seeing it listed in the bulletin. Kramer at the time of viewing the property with Grey suggested to Grey that the Singhs, who owned a business next door to the property in question, might be interested. Upon returning to their office Kramer called the Singhs on the telephone and told Mrs. Singh that the property next to them was being offered for sale and she stated that they wanted to buy it. The Singhs brought $2,000 to Grey's office at once and signed the deposit receipt offer to buy the property at the price under the conditions offered. Grey took the document to Baizer at the Thornbury office.

On Tuesday, January 24, 1961, Baizer presented to Mrs. Burkhart for her signature the deposit receipt offer to buy the property. The document on its face recited that ''Karm & Mary Singh H & W as Jt. Tenants'' of ''426 Lincoln

Blvd.'' had placed the sum of $2,000 as a ''deposit on account of the purchase price'' of the property in question subject to a portion of the taxes, conditions and easements of record ''for the purchase price of fifty two thousand five hundred dollars.'' $15,000 was to be paid through escrow and the seller to take back a first deed of trust to secure the payment of the balance of $37,500 payable at $350 per month or more, including interest on the balance at 6½ per cent until paid. It was set forth that the property was to be sold ''as is'' subject further to an existing lease on the store building (which lease expired June 30, 1964, with an option to renew for five years more). The lease of the store provided for a rental of $250 per month, and two small houses at the rear rented for $75 and $95 per month respectively. The deposit receipt offer also provided ''this is to be a 60 day escrow or less'' and that ''time is the essence of this contract.'' The agreement apparently was prepared by Sidney B. Grey's office as it set forth his name as a broker and his license number as such, by Max Kramer as the salesman.

Karm and Mary M. K. Singh signed the document under the words, ''I agree to purchase the above described property on the terms and conditions herein stated, and receipt of copy of herein agreement is hereby acknowledged'' as the ''purchaser.'' Mrs. Burkhart signed the document under the words, ''I agree to sell the above described property on the terms and conditions herein stated and agree to pay the above signed broker as a commission the sum of twenty six hundred twenty-five & 00-100 dollars, or one-half the deposit in case same is forfeited by purchaser, provided the same does not exceed the full amount of the commission. Receipt of copy of herein agreement is hereby acknowledged,'' as the ''seller.''

On January 24, 1961, Grey opened an escrow at the Santa Monica Bank and deposited the $2,000 received from the Singhs in escrow. Later on that same day the Singhs signed the escrow instructions. The escrow instructions provided among other things that the total price for the property was to be $52,500 of which $37,500 was to be paid in installments of $350 per month including interest at the rate of 6½ per cent (such obligation to be evidenced by a promissory note secured by a first deed of trust upon the property) and $15,000 was to be paid ''prior to March 24, 1961,'' ''of which amount $2,000 has been paid to broker Sidney B. Grey and deposited by him in escrow.'' A note in the proper amount

and form was signed by the Singhs as was a deed of trust securing the same and left with the escrow holder.

Apparently Mrs. Burkhart told her son-in-law Max Schiff (interlocutory decree of divorce in *Schiff* v. *Schiff*, March 21, 1961) who was the tenant of the store building that she was selling the property and wanted to show him the papers. Schiff asked Mrs. Burkhart to come to the store the next day. She went there with the copy of the deposit receipt which she had signed. Schiff immediately upon seeing the signed instrument called an attorney (one of present counsel for appellant) and told him in effect that Mrs. Burkhart had sold the property and ''I just would like to know what we could do to get out of it.'' Schiff and Mrs. Burkhart went to the attorney's office the next day, Friday afternoon, January 27, 1961, where Mrs. Burkhart apparently was questioned about the transaction. The attorney called the bank where the escrow was located and inquired whether any money other than the $2,000 had been deposited. On Monday, January 30, 1961, the attorney signed a notice of rescission for Mrs. Burkhart and Schiff. The purported rescission notice was received by the Singhs on or about January 31, 1961—it set forth among other things that Mrs. Burkhart was entirely without understanding and of unsound mind.

From January 24, 1961, to January 30, 1961, Mrs. Burkhart refused repeatedly to go to the bank to sign the escrow instructions or even to read a copy of the same. She stated in effect that she was not going to go through with the deal, that she was not going to sign any escrow papers. In short that ''she wouldn't go to escrow—and that was the end of it.'' Baizer, the seller's broker, called Kramer, the buyer's broker, stating that ''the deal was off.'' As a consequence the Singhs were advised by their broker under the circumstances to deposit no more money into the escrow at the bank until it was ascertained and determined whether Mrs. Burkhart was going to proceed with the transaction. In other words Mrs. Burkhart repudiated the agreement to sell the property (apparently at the insistence and direction of Schiff the lessee of the store building and her then son-in-law). Schiff had called Baizer and had told him that the deal was not a good one for Mrs. Burkhart and that he, Schiff, had told Mrs. Burkhart not to sign the escrow instructions when she was requested to do so.

On or about Thursday, February 9, 1961, a petition for the appointment of a guardian for Mrs. Burkhart was filed

by Schiff. He set forth in his petition for appointment as such guardian that he was the son-in-law of Mrs. Burkhart and that she was incompetent and needed a guardian. The matter was noticed for hearing for February 27, 1961, at which time Schiff and his then wife testified. An order was made on March 2, 1961, appointing Schiff as the guardian of Mrs. Burkhart. Letters of guardianship were issued to him on March 7, 1961.

On February 10, 1961, the Singhs commenced this action to compel the defendants, Mrs. Burkhart and Schiff, to perform the contract for the sale of the real property. Mrs. Burkhart answered the complaint on March 6, 1961, by and through Schiff as her guardian. She alleged among other things that she did not have the legal capacity on January 24, 1961, to agree to sell the property, denied that an escrow was opened, denied that she was requested to sign the escrow instructions, denied that she ever was asked to execute a conveyance. As affirmative defenses, she alleged that (1) she was without understanding; (2) was adjudged incompetent February 27, 1961; (3) the agreement was with the mutual understanding that it would qualify "as an installment sale under the Internal Revenue Code"; (4) consideration was inadequate; (5) agreement lacked mutuality; (6) agreement lacked certainty; (7) parties entered into agreement on the condition that it would qualify as an installment sale under the Internal Revenue Code; and (8) that plaintiffs and their agents represented that the agreement of January 24, 1961, would qualify as such an installment agreement which was untrue.

At the trial Mrs. Burkhart did not testify nor does it appear why she was not present at the trial. She was examined by a court-appointed qualified psychiatrist for the plaintiffs prior to the trial. During the trial respondents attempted to call the doctor out of order for the obvious purpose of showing that Mrs. Burkhart was perfectly competent on the date she signed the agreement to sell the real property. The offered testimony was to be for rebuttal purposes; however, at the time plaintiffs wanted to call the doctor to testify there was nothing to refute with reference to Mrs. Burkhart's competency.

At the conclusion of the testimony of the witnesses, counsel for the respective parties and the judge made certain statements.[1]

---

[1] "MR. LEVIN: No further questions of this witness.

Several experts testified at great length for the plaintiffs with reference to the market value of the property to the effect that on the contract date the property was reasonably worth $52,500 or less.

Appellant now asserts that because plaintiffs failed to deposit the full $15,000 in escrow within three days from January 24, 1961, they are now barred from obtaining specific performance of the contract; that plaintiffs had no intention of depositing $15,000 into the escrow within the three-day period following the signing of the agreement; that plaintiffs are not entitled to specific performance because the defendants' agent exhibited bad faith, in that the two brokers were to share the commission under the multiple listing agreement; that the evidence was insufficient to establish that the price of the property was adequate; that the adjudication of incompetency cannot be collaterally attacked; that Schiff had no authority or power to waive his ward's defense of incompetency and that the judgment failed to provide explicitly that the plaintiffs were to execute a first deed of trust on the property to secure payment of their note for $37,500.

■ The rights of the parties are governed by the terms of the deposit receipt agreement. ■ It is obvious from

Your Honor, at this time I'd like to make an offer of a stipulation. I'd like to offer to stipulate with respect to the matter of contentions of defendant raised in the joint pretrial statement on page 12, at line 21, being number f, small f, of the contentions, which is the defense of the alleged incapacity of the incompetent, Ida Burkhart, on the date of the contract.

Clearly the evidence shows there was no such adjudication on the date of the contract. So therefore the evidence that could be presented to this Court to bear on that issue would be further testimony from Mr. Schiff, perhaps further testimony from Mr. and Mrs. Singh, and anybody else that counsel for plaintiffs might wish to bring in in the way of lay persons, and further testimony from two experts.

I know, I was present when Dr. McNeil examined, pursuant to court order, the incompetent person, after the adjudication of incompetency.

I will stipulate in that regard that if Dr. McNeil were called, that he would render an opinion in this Court that in his opinion on January 24, 1961 the defendant, Ida Burkhart, at all times here in question was a person entirely with understanding, and could deliver a valid conveyance for the transfer of title to her said real property, and had the capacity to do so.

I will stipulate further that if he were called to testify in this proceeding, he would testify that in his opinion, that the defendant Ida Burkhart at all times here in question, and particularly on January 24, 1961, did not lack the capacity to understand the nature of the subject matter before her, namely the contract dated January 24, 1961, and knew the effect of signing same.

My offer of stipulation further is that an expert witness who has examined the defendant, Dr. Jerome Kummer, of this city, of 2200 Santa

the record in this case that the failure upon the part of the Singhs to make the full deposit of the $15,000 into the escrow was entirely due to the acts and conduct of Mrs. Burkhart and Schiff. (See Civ. Code, § 1440.)[2]

The rule in this state is to the effect that if one party notifies the other, before the latter is in default, that he will not perform the contract on his part, the other party may

Monica Boulevard, if called to testify in this proceeding, would testify as follows with respect to these two——

THE COURT: You better take them one at a time.

THE COURT: Are you willing to stipulate that Dr. McNeil would so testify?

MR. SCHNIDER: Your Honor, without restricting my right to call Dr. McNeil in any manner whatsoever——

THE COURT: If you're going to call him, we don't have a stipulation.

MR. LEVIN: I am trying to save the Court's time.

MR. SCHNIDER: Without restricting my right to call Dr. McNeil, should it become apparent to me that such is necessary, I am willing to accept his stipulation with this understanding, that we read into the record Dr. McNeil's opinion as to what he will testify to. Mr. Levin has a copy of it, and I have the original.

MR. LEVIN: I don't have a copy of that.

THE COURT: Have you seen it?

MR. LEVIN: No, I haven't. I don't think you have ever served me or given me a copy of it. I have my notes from the time when I was present.

THE COURT: Apparently we have no stipulation. Let's proceed.

MR. SCHNIDER: May I examine this for a moment and then perhaps we do have a stipulation?

THE COURT: We will take a short recess.

(recess)

MR. LEVIN: Before I call a witness, your Honor, if the Court please, at this time I wish to do something which is very difficult to do, I have never done it before. But upon serious consideration and full consent of the guardian who is charged with the responsibilities of prosecuting this defense, for the protection of the estate of the incompetent, I am waiving the defense of incapacity, having in mind that the defense of incapacity here is one that was raised, and also the matter of incompetency was adjudicated also after the fact of the contract, January 24, 1961.

In this waiver, I do not wish any implications to take place or to be considered by the Court or by counsel that I did not have Mrs. Burkhart thoroughly examined by an expert—and he was available on my call to be in this proceeding and testify—I won't give the testimony—but he was available to testify on behalf of the guardian.

THE COURT: No implication. If the defense is withdrawn, period. The implication is that the Court necessarily has to find that she was competent.

MR. SCHNIDER: May the record reflect, your Honor, that I raise no implication of any kind whatsoever as a result of the withdrawal of this defense.

I am fully aware of the fact that you may plead any defense you wish and withdraw it any time you wish, even inconsistent defenses.

MR. LEVIN: I don't believe this defense was inconsistent in any way.

THE COURT: You have said enough. You have withdrawn it. That's it.''

[2] ''§ 1440. *When performance, etc., excused.* If a party to an obliga-

enforce the contract without previously performing conditions in favor of the party giving such notice of nonperformance. (12 Cal.Jur.2d 454; 17 C.J.S., Contracts, § 472, p. 975.) In *Vineland Homes, Inc.* v. *Barish*, 138 Cal.App.2d 747, 760 [292 P.2d 941], this court said:

"Appellants' refusal to execute escrow instructions or conveyance without reservation to themselves of oil and mineral rights leaves no doubt that, had respondent placed the full amount of the purchase price in the escrow started by it, the result of the escrow would have been the same. The formal tender of the full purchase price would have been a useless act. The law does not require the performance of useless acts. (*Ruzich* v. *Boro*, 58 Cal.App.2d 535, 541 [137 P.2d 51]; *Ehrhart* v. *Mahony*, 43 Cal.App. 448, 451 [184 P. 1010].)"

See also *Beverage* v. *Canton Placer Mining Co.*, 43 Cal.2d 769, 777 [278 P.2d 694]; *Semas* v. *Bergmann*, 178 Cal.App.2d 758, 762 [3 Cal.Rptr. 277]; *Local* 659, *I.A.T.S.E.* v. *Color Corp. of America*, 47 Cal.2d 189, 198 [302 P.2d 294].

Appellant places great reliance upon what is stated in *Pitt* v. *Mallalieu*, 85 Cal.App.2d 77 [192 P.2d 24]; however the facts of the case at bench and the facts in the *Pitt* case are in no sense similar. See *Groobman* v. *Kirk*, 159 Cal.App.2d 117, 121 [323 P.2d 867]; *Diamond* v. *Huenergardt*, 175 Cal. App.2d 214, 222 [346 P.2d 37].

█ Repudiation is a question of fact to be determined from the evidence. █ Here the evidence was clear that following the moment Mrs. Burkhart told Schiff that she had sold the property she refused to do anything toward completing the transaction and effectively repudiated her agreement. (See *Wilton* v. *Clarke*, 27 Cal.App.2d 1, 4 [80 P.2d 141]; *Nemanick* v. *Christensen*, 87 Cal.App.2d 844, 847 [197 P.2d 785]; *Gold Mining & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 28 [142 P.2d 22].)

With reference to the assertion by appellant that the plaintiffs never intended to deposit any funds in the escrow and therefore a fraud was imposed upon Mrs. Burkhart, it appears first of all there is no pleading claiming such a misrepresen-

tion gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

tation and secondly even if there were such a pleading there is no evidence to support it. There is a great deal of evidence to the effect that the Singhs would have and could have put up whatever money was necessary and required at any time but they were deterred from doing so by the repudiation of the seller.

There likewise is no evidence of any other fraud upon the part of the brokers or the salesmen or either of them or of the Singhs. No useful purpose would be served by setting forth at length the testimony with reference to this phase of the case, but suffice it to say that the court from its own questions and the answers received thereto and from the entire record was convinced that the transaction was entirely free and clear of any fraud.

The value of the property was explored at great length and as heretofore stated at least three experts testified that the property was reasonably worth $52,500 or less.

The record is clear that as of the dates with which we are particularly concerned Ida Burkhart was competent to execute the agreement of January 17, 1961, and the contract of January 24, 1961. Appellant now seems to assert that the defense of incapacity as of the date of the contract could not be withdrawn at or near the conclusion of the taking of testimony in the case. No authority in point is cited by counsel.

The trial court very carefully did not go back of the determination that Ida Burkhart was declared an incompetent in March of 1961. In the trial of this case however the judge was concerned with whether she was competent or incompetent, so to speak, as of January 17 and January 24, 1961, and there was no evidence that she was incompetent on either of those dates and there was considerable evidence that she was competent. Under this state of the evidence counsel for the defendants saw fit with the concurrence of the guardian to withdraw the contention of incompetency as to the particular dates in question. There was no pretense of any attempt to invalidate the determination made in March of 1961. In fact the file in the incompetency proceedings was introduced into evidence by the plaintiffs.

Appellant's last contention is to the effect that the judgment as presently written fails to provide that upon the execution of a deed by Ida Burkhart, by her guardian, that the plaintiffs shall execute a first trust deed on the property to secure payment of their note for $37,500. The contention is well taken. It is apparent that in the preparation of such

judgment the provision contended for by the defendants was inadvertently omitted, for in the second part of the judgment which provides for the contingency of the defendants' failing to execute the deed the clerk of the court is to execute the deed upon payment of the $15,000 and interest and depositing with him "the promissory note and First Deed of Trust as heretofore set forth." The plaintiffs have stipulated in this court that the provision should be in the judgment.

It is therefore ordered that paragraph 3 of the judgment be amended by adding thereto the following: The plaintiffs shall further execute and deposit in said escrow above mentioned a first trust deed in the form as customarily used by banks or trust companies (in the Santa Monica area) to secure the payment of the promissory note above described.

As amended and modified the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.